**LOCAL 36 OF INTERNATIONAL FISHER-MEN & ALLIED WORKERS OF AMER-ICA et al. v. UNITED STATES.**

No. 11638.

United States Court of Appeals
Ninth Circuit.

Sept. 28, 1949.

Rehearing Denied Nov. 29, 1949.

322

**324**

———♦———

Gladstein, Andersen, Resner & Sawyer, San Francisco, Cal., Gallagher, Margolis, McTernan & Tyre, Kenny & Cohn, Ben Margolis, Robert W. Kenny, Los Angeles, Cal., and George R. Andersen, San Francisco, Cal., for appellants.

William C. Dixon, Sp. Asst. to Atty. Gen., Walter M. Lehman, Sp. Atty., Washington, D. C., Ernest A. Tolin, Chief Asst. U. S. Atty., Los Angeles, Cal., Herbert A. Bergson, Asst. Atty. Gen., Holmes Baldridge, Sp. Asst. to Atty. Gen., for appellee.

Before STEPHENS and BONE, Circuit Judges, and FEE, District Judge.

JAMES ALGER FEE, District Judge.

The United States initiated this criminal action against the defendants by indictment charging the violation of the Anti-Trust Act, 15 U.S.C.A. §§ 1–7. The cause was tried before a jury. A verdict of guilty was found. This appeal has been taken upon the main grounds that (1) the indictment does not state a crime, (2) that evidence vital to defense was rejected, (3) that the verdict was against the evidence, (4) that the Court did not properly instruct the jury, and (5) that the method of drawing the juries in this district was improper and that a conviction in this case cannot stand, irrespective of the fairness of the trial. These general classifications of exceptions will be dealt with in this order. At the argument before this Court, counsel for appellants took the position that the sufficiency of the indictment was the vital point of the appeal.

The indictment charges a conspiracy to restrain and an actual restraint of trade, over a large territory in the southwestern United States,[1] in one of the most highly important and highly perishable articles of food given to mankind, namely, fresh fish and crustaceans, coming into "fishing ports"[2] for sale to dealers. The fishing area, according to the indictment, includes the waters, both territorial and foreign, off Southern California south of Morro Bay and the territorial waters of the west coast of Mexico.[3] It is then alleged: "Approximately 75% of all fishermen in the fishing area defined herein are members of defendant Local 36, IFAWA."[4]

These fishermen are alleged to be the: "* * * individual or group of individuals who own, lease or operate a particular boat for the purpose of engaging on their own account in the business of catching fresh fish and crustaceans in the fishing area, and bringing them to fishing ports for the purpose of sale to dealers."

The charge as to the nature of the association is that: "The fishermen who are members of Local 36, IFAWA are not employees, workers, or laborers who receive a salary or wage for their work or labor, but are independent businessmen engaged in business on their own account,

---

1. "Western States of California, New Mexico, Arizona, Nevada, Colorado, Utah and Idaho."

2. "Southern California ports located between Morro Bay and the Mexican border, including, but not limited to, Morro Bay, Santa Barbara, Santa Monica, Redondo Beach, San Pedro, Newport Beach, and San Diego."

3. Mark the difference between fishing areas and territory of distribution.

4. Local 36 of the International Fishermen and Allied Workers of America.

and who operate fishing boats for their own account and profit. No employer-employee relationship exists between these fishermen and the dealers to whom their catch is sold. The fishermen members of Local 36, IFAWA, sell their catch directly to dealers, and do not act collectively through Local 36, IFAWA, in catching, producing, preparing for marketing, processing and handling their catch."

The gist of the charge is that defendants have: " * * * knowingly and continuously engaged in a wrongful and unlawful combination and conspiracy * * * to fix, determine, establish, and maintain arbitrary, artificial and non-competitive prices for the sale to dealers of fresh fish and crustaceans caught in the fishing area, and to prevent dealers who do not agree to pay said prices from obtaining, selling or shipping any fresh fish or crustaceans, which combination and conspiracy has been in restraint of the aforesaid trade and commerce, in violation of * * * the Sherman Act."

Elaboration in detail of this charge is presented in the indictment.

In summary, the means and methods of carrying out the conspiracy as charged consisted of a continuing agreement and concert of action, the substantial terms of which were that appellants (1) agree to fix minimum prices to be charged for the sale of fresh fish and crustaceans caught by the fishermen in the fishing area and sold to dealers, (2) agree that these prices so charged by fishermen members of the local shall be stabilized and non-competitive, (3) agree to draw up a written contract form, "and to impose said contract upon fish dealers who refuse to sign the same by picketing and boycotting methods, and to prefer fish dealers who sign said written contract, and to refuse to sell or deliver any fish caught by fishermen members of Local 36, IFAWA to fish dealers who do not enter into said contract;" (4) agree to prevent non-cooperating dealers from obtaining fresh fish from any other source by similar methods, (5) agree to prevent such dealers from shipping or transporting any fish, (6) agree to boycott any concern or individual accepting from such

dealers fish for shipment in or outside California, (7) agree to picket and boycott any concern delivering fish shipped from brokers or others in or outside California to such dealers, (8) agree to prevent non-member fishermen from fishing or delivering fish to any than a cooperating dealer, and only to such dealer: "after said non-member fishermen had picketed non-signing dealers, or in lieu thereof, had paid to Local 36, IFAWA a stipulated picket fee."

It is specifically alleged that "defendants, by agreement and concerted action have done the things which, as hereinbefore alleged, they conspired to do," for the purpose of forming and effectuating the conspiracy and combination set up for the purpose of forcing and coercing fish dealers into signing the aforesaid form of contract, threatened to withhold and have withheld from said dealers, supplies of fresh fish and crustaceans, and by boycott and picketing methods have attempted to prevent and have prevented said dealers who refused to sign said form of contract from securing fresh fish or crustaceans from any other source.

The result of the combined action then, according to the allegations of the indictment, was that: "Except for the illegal restraints described hereinafter, a much greater volume of fresh fish and crustaceans would have been brought to the fishing ports named herein and sold, processed and distributed from these ports in interstate commerce." And also the effect was that: "The aforesaid agreement and concerted action of the defendants, pursuant to and in furtherance of the conspiracy herein alleged, has had the effect, as intended by the defendants * * *"

(1) of preventing fishermen from carrying on normal fishing operations in the area, (2) of preventing fish from being sold to the non-cooperating fish dealer and "has further resulted in the fixing of arbitrary and non-competitive prices" for the fish sold by the members of the local to cooperating dealers, and has prevented the public in the territorial area from receiving a normal and usual supply of fresh fish, and "has unreasonably restrained the

interstate and foreign trade and commerce described * * *."

█ The contract specifying the prices proposed between the fishermen and the dealers is attached to the indictment. We have no occasion to consider whether, standing alone, a charge of the execution of this contract by dealers and fishermen belonging to the organization would have stated a violation[5] of the statute or not. But the indictment must be considered as a whole.[6] A charge which indicates that 75% of the fishermen, as independent businessmen belonging to the organization, agreed not to let any fishermen fish in the high seas and in the territorial waters of Southern California and Mexico or to deliver fish to any other than a cooperating dealer except on the specified conditions, whether by their consent or not, is a charge of a conspiracy in direct and illegal restraint of interstate and foreign commerce. Fishing in such waters falls into the rubric of such commerce. Transportation of the fish to the market at the specified cities from the high seas and territorial waters is commerce. All the fishermen were engaged in interstate and foreign commerce. This was developed by allegation as an integral part of the scheme. The charge that appellants, with such control, intended to and effected such a restraint over production in interstate and foreign commerce, was alone sufficient. This is the selection of only one feature from the indictment. There is also charged a conspiracy to control all of the fishermen of the fishing area and all the fish dealers of the territory involved, with the intent of obtaining a monopoly of the catching and selling all fish by restraining all fishermen, dealers, carriers and outside suppliers of fish. The purpose to grant preferential and equal rights to the signing dealers and to exclude non-signing dealers from the market is likewise set up. But the gist of the accusation is the allegation of a conspiracy to fix arbitrary, artificial and non-competitive prices[7] for all fish so caught and sold by any fisherman to any dealer.

It is true the application of pressure is charged only in the interstate fishing ports, but that is sufficient.

█ The main focus of the attack upon the indictment is that, taken in connection with other facts not alleged therein, the allegations do not state a crime. The thesis is that appellants were "working original producers, combined for the purpose of fixing the price of the products of their own labor" and therefore were protected by the Clayton and Norris La Guardia Acts, 15 U.S.C.A. §§ 12 et seq., 29 U.S.C.A. §§ 101 et seq., as a labor union, and were protected by the Fishermen's Marketing Act, 15 U.S.C.A. §§ 521 et seq., "as members of a cooperative." The confusion of thought of counsel for appellants in these conflicting claims is manifest. Even if the Court took judicial knowledge of the "facts" assumed, the indictment still states a crime. But the existence of an employer-employee relationship between the fishermen and the dealers is therein expressly negatived. It is distinctly denied also that the union was acting as a cooperative bargaining agent for the fishermen with the dealers. It is stated that the fishermen are independent businessmen dealing with the fish for their own profit and advantage. Appellants contend that, "from the face of the indictment, plus facts of which the Court may take judicial notice," no public offense is stated, which amounts to a speaking demurrer. In construing an indictment on demurrer, the courts cannot consider extraneous matter.[8] Finally, the al-

5. United States v. Swift & Co., D.C., 46 F.Supp. 848, 852.

6. McCoy v. United States, 9 Cir., 169 F.2d 776, 780; United States v. New York Great Atlantic & Pacific Tea Co., Inc., 5 Cir., 137 F.2d 459, 464; United States v. Ellis, D.C., 43 F.Supp. 321, 326. Cf. Glasser v. United States, 315 U.S. 60, 80,

62 S.Ct. 457, 86 L.Ed. 680; United States v. Sorrentino, D.C., 78 F.Supp. 425, 428.

7. United States v. Frankfort Distilleries, Inc., 324 U.S. 293, 296, 65 S.Ct. 661, 89 L.Ed. 951; United States v. St. Joseph Stock Yards Co., D.C., 44 F.Supp. 31, 34.

8. United States v. Empire Hat & Cap Mfg. Co., D.C., 47 F.Supp. 395, 401.

legations are such that, even without these negatives, no group could be permitted to combine for the purpose therein set up of restraining production of, transportation of and trade in food fish in a vast territory.[9] The indictment stated a crime.

Once these facts are alleged and the effect of these two statutes and similar acts removed from contemplation, independent businessmen have no immunity to enter into agreements and combinations with the intent and purpose of restraining interstate commerce, which have the actual effect of restraint. The indictment was not vulnerable to the attack made. If proved beyond a reasonable doubt, including the negatives, the allegations of the indictment would warrant conviction.

The evidence showed that the allegations of the indictment were fully proved as to scope of the conspiracy. The proof tended to show a concert by the appellants to compel by force uniform action by dealers and fishermen to establish a stabilized, arbitrary price for fresh fish in the area. It is significant that the dealers did not enter into the agreement suggested voluntarily, but only when subjected to compulsion. Some of them took the ground that they had been advised such a combination of organized workers and businessmen dealing in the product would be illegal. If the fishermen had been members of a labor union, the position would have been sound according to the underlying principle of the Brims case (Brims v. U. S.),[10] the Columbia River Packers case (Columbia River Packers Ass'n v. Hinton) [11] and United Brotherhood of Carpenters and Joiners of America v. United States.[12]

The allegations of the indictment were fully proved as laid as to the scope and in-tent of the conspiracy.[13] The combination and concert of action were established with the primary objective of fixing and maintaining "arbitrary, artificial and non-competitive prices" and a subsidiary objective of excluding from the market non-cooperative dealers by preventing such dealers "from obtaining, selling or shipping any fresh fish." The corollary also charged established by proof that fishermen not belonging to the association were prevented from fishing at all on the high seas or in territorial waters unless they were subservient to the conspirators. The evidence showed that non-cooperating boats owned by independent fishermen were dubbed "unfair" and were warned to conform.

It was also proved that incidental services, such as ice, were withheld by pressure from "unfair" boats and non-cooperating dealers. Deliveries to non-cooperating dealers of fresh fish shipped to them were stopped by pressure and threatened violence to express agencies, railroads, truck lines and other carriers, according to the record. There was evidence also of appeals broadcast to fishermen in other states to stop the flow of fresh fish into this area in interstate commerce.

The operations of the fishermen and dealers were proved to be in interstate and foreign commerce. The record shows fresh fish were shipped by the dealers to points in many southwestern states, and fresh fish were shipped into Southern California, not only from Northern California but from Oregon and Washington. Not only members of the local, but the independent fishermen as well, fished off the shores of California in the territorial waters of Mexico and on the high seas. Their boats then mingled with ships on open highways of the world, and the fish from

---

9. The statute does not confine its protection to consumers. Mandeville Island Farms, Inc., v. American Crystal Sugar Co., 334 U.S. 219, 236, 68 S.Ct. 996, 92 L.Ed. 1328. See Apex Hosiery Co. v. Leader, 310 U.S. 469, 493, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044.

10. 272 U.S. 549, 47 S.Ct. 169, 71 L.Ed. 403.

11. 315 U.S. 143, 62 S.Ct. 520, 86 L.Ed. 750.

12. 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973.

13. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680; United States v. Sorrentino, D.C., 78 F.Supp. 425, 428.

there landed at the fishing ports was a product in foreign commerce.[14]

Besides, there was an effective restraint applied at the local level,[15] which was intended to and did have an effect upon interstate and foreign commerce. It was proved that both members of the union and independent fishermen were restrained from fishing in the areas above mentioned and were placed under various restrictions by the "strike" committee, as to where the fish so caught should be disposed of. Certain independent fishermen were compelled to dump their catch, in violation of the law of California[16] and the moral dictates against waste of food. There is then evidence that the squeeze was applied all along the line, and, even if the source and application of the restraint were intrastate, it could be found that the necessary effect was "to stifle or restrain commerce among the states." United States v. Woman's Sportswear Manufacturers Association, 336 U.S. 460, 464, 69 S.Ct. 714, 716.

 The ends desired by the appellants according to the evidence were accomplished by picketing and boycotting and by unconcealed threats of violence and pressure. Appellants objected to this evidence, but it was properly received. The Clayton Act does not operate by prescribing silence on the issue and preventing the production of evidence. Even where a union is involved, evidence as to picketing and boycotting may be introduced if the case is submitted to the jury with the proper instructions. United Brotherhood of Carpenters and Joiners of America v. United States, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973.

This combination had substantial proportions according to the record. The association and fourteen individuals appeal. There is evidence that by far the greater number of the fishermen who catch in the fishing area are members of the association. About twenty million pounds of fresh fish are caught annually in this fishing area and sold to dealers in these ports. In the neighborhood of one million pounds of fresh fish were shipped to dealers in these designated ports from places outside of California. There is considerable fresh fish caught by fishermen in the fishing area, which is shipped to other states of the Southwest. The restraint of interstate and foreign trade imposed for a month at these points might have been found from the evidence to have been substantial, to have been direct and effective, and to have been unreasonable if such findings were required.

 The written agreement in the form in which the dealers were required to sign was drafted so as to appear innocuous upon its face and to be couched in self-serving language indicating beneficent design upon the part of the organization. The proof gave ground to belief that the combination and conspiracy had a broader purpose of domination in the territorial area and at the fishing ports and the fixing of arbitrary prices and the exclusion of non-cooperative dealers and independent fishermen. The evidence supported every charging phrase of the indictment. There was no other objection to this evidence now relied upon, save one. The Court permitted introduction of summaries of the contents of books of account concerning volume of fish handled by dealers. In view of the

14. Manaka v. Monterey Sardine Industries, Inc., D.C., 41 F.Supp. 531, 533; The Abby Dodge, 223 U.S. 166, 176, 32 S.Ct. 310, 56 L.Ed. 390; Lord v. Steamship Company, 102 U.S. 541, 544, 21 L.Ed. 224.

15. The amount of the industry control by a group throughout the country is immaterial so long as control is exercised effectively in the area concerned. Mandeville Island Farms, Inc., v. American Crystal Sugar Co., 334 U.S. 219, 236, 68 S.

Ct. 996, 92 L.Ed. 1328; United States v. Yellow Cab Co., 332 U.S. 218, 225, 67 S.Ct. 1560, 91 L.Ed. 2010; Indiana Farmer's Guide Publishing Co. v. Prairie Farmer Publishing Co., 293 U.S. 268, 279, 55 S.Ct. 182, 79 L.Ed. 356; Montague & Company v. Lowry, 193 U.S. 38, 46, 24 S.Ct. 307, 48 L.Ed. 608. Cf. Steers v. United States, 6 Cir., 192 F. 1, 5.

16. Deering's California Fish and Game Code, Ch. 5, Art. 4, § 1064.

situation that the dealers were engaged in a difficult economic situation and that unfriendly relations were shown, there was no obligation on the Trial Judge to permit examination at large of the records by hostile appellants without supervision. In some cases, the witness testified from memory, and the Court refused to allow examination as to books or their contents. All this was proper in the discretion of the Trial Judge. In neither instance do appellants show that there was any prejudice. The Trial Judge was not bound to assume the demand for complete examination of the books of dealers in a highly explosive situation was without ulterior motive. Cross-examination was not otherwise limited.

The defenses are the same matters which were urged as defects in the indictment. Appellants claim they were entitled to the protection of the Clayton Act and the Fishermen's Marketing Act. The argument upon this question is highly theoretical and is made with entire disregard of the state of facts shown in the record, and proceeds upon the assumption that Local 36 is a labor union. But the application of the statutes must be made, not by scholastic reasoning divorced from the record, but from the facts.

A large proportion of the members of the association owned and operated their own boats and gear. Well over half of these members classify themselves as self-employed fishermen. The ownership of boats and gear differentiates the owner from the other fishermen in this respect, that the operation of boat implies repairs, reconditioning and expenses of various types. The payment for this upkeep and profit for the operation of the boat, including amortization of investment, and gear is obtained, where there are more fishermen engaged, by an agreed share of the catch. But there are numbers of these boats which have only the operator and owner himself aboard. In this instance, the work of the owner and the profit and investment are all paid for by the price of the fish. It may be agreed that the owner and operator of a truck garden, who employs no labor and who sells his produce to local markets, is in a much similar situation. There can be no doubt the fisherman and the truck gardener are independent businessmen. The fishermen themselves consider the boat the important factor. The evidence here shows that, when this difficulty was going on, the so-called "strike committee" brought pressure to join in their activities, not on the individual fishermen but upon the "boat." The records refer to thirty-five boats to be contacted and, if they do not help in the strike, "action is to be taken against them." This unquestionably reflects the actual condition. The evidence indicates that the boatowner or captain ordinarily on this account does the bargaining with the dealer for the sale of the catch. The reason for this is clear. Bargaining must be done by one person. But the evidence shows that the dealer pays the captain or owner, who receives the compensation for the full catch. Although there was a possibility of employment between the captain and the fishermen in the same boat, that was not the attitude of the fishermen themselves. It is noteworthy that, as to the time upon which they embark upon a fishing trip, the locality to which they go, the type fish which they intend to take depends upon agreement between the individual fishermen in a boat and the captain. Although there is no direct evidence upon the point, it is inferential that the share of the boat and the individual fishermen depends likewise upon such an agreement. Judge McLaughlin, of Hawaii, draws this inference in dealing with a similar situation. He says:

"Defendants argued that since fishermen's—crewmen's—wages are dependent upon the price at which the boatowner sells the catch, the crewmen who share in the proceeds cannot possibly get an increase in wages unless the price of fish is raised, therefore this is a 'labor dispute' relating to fishermen's wages.

"This is nothing but specious reasoning. In the first place the facts do not reveal that the crewmen are negotiating the subject of wages or percentage shares of the proceeds with the boatowners by whom they are employed, and further it just is not so that the only way crewmembers could get

increased wages would be to effect an increase in the price of fish. Defendants overlook the position of the boatowner and adjustments and absorptions he might make to increase wages without affecting the price of fish." Hawaiian Tuna Packers, Limited, v. International Longshoremen's and Warehousemen's Union, (C.I.O.) et al., D.C., 72 F.Supp. 562, 566.

The arrangement under the record in this case is a joint adventure of the fishermen, including the owner or captain, the details depending upon mutual consent of all. So much for the internal economy of a "boat."

The fish are sold by the bargaining agent of the boat to the dealer. There is no compulsion. Any one of the dealers may be chosen by the "boat," or the fish may be used or stored in ice. It is true that the boat usually brings the catch to the same dealer. By inference, we may conclude that an order from a distance could be accepted by the "boat" also. In any event, the price is arrived at by open negotiation between the representative of the fishermen of the "boat" and the dealer whom they have selected. This price is paid in cash. The individual fishermen do not receive this price, but it goes to the bargaining agent of the "boat" and is later divided according to the agreed scheme. The transcript shows such transactions are referred to universally as "purchases" and "sales." The dealers are called "buyers" and the fishermen "sellers." The results of such sales are called the "price." The price for the catch depends upon skill in bargaining and the available supply and also the orders which the particular dealer has on hand. The fishermen, whether boatowners or not, are independent of any dealer. No fisherman regards himself as under orders, directions or controls of any dealer. On the other hand, he regards himself as only bound to agree with the other persons in his boat as to operations. There is no evidence of any negotiations for sale of fish or receipt of price by Local 36 on behalf of any boat or any fishermen, whether members or not. If one were disposed to rationalize, it might be conceived that members of a particular boat could choose a different "employer" each time they brought

in a different catch. Some household employees do day work in this fashion, selecting a different employer day by day. But it is difficult to discover any evidence of relation and employment to be submitted to a jury here where sale and purchase of a commodity were involved and the price was the measure of value thereof. To translate this into "wages" requires a complicated computation. The result of this resume of the evidence is that no inference that Local 36 is a labor union could be drawn. The facts are not compatible with the proposition that the fishermen who own and operate their own boats are employees of any one. It might be contended that a fisherman who works in a boat of which he is not the owner is an employee of the boatowner. It is only by distortion of the evidence of the record here that this induction could be drawn.

A finding of fact to the effect that the boatowners or the affiliated fishermen were employees of one or more dealers would be a diametric contradiction of all evidence on the subject. In accordance with the charge of the indictment, it might properly have been found that there was no relation of employer and employee between dealer and fisherman, and that appellants were independent businessmen dealing in fish for their own profits.

On the evidence, however, a finding that the fishermen members of the association were "independent businessmen engaged in business on their own account and who operate fishing boats for their own account and profit" was justified. It might also have been possible to find that Local 36 was an association under the Fishermen's Marketing Act and that the members were joined together for the collective purpose of carrying on legitimate objectives of "catching, producing, preparing for market, processing, handling and marketing fish caught by their members." Although it was not possible to find from a review of the record that in this instance the association was acting as the marketing agent for the members, still the evidence does show that, so long as the efforts of the members and the Local were confined to an agreement among themselves and the

dealers, arrived at by negotiation and setting of certain price levels for fish to be caught, but having no coercive force behind it, no action was taken by the Government. This is also the explanation of the dismissal of the prosecution in a case based upon that feature alone.[16a] This position may be subject to question, but at least it does not affect the problem here. However, the record shows that the fishermen here viewed as members of a cooperative had much broader purposes underlying the concert of action above outlined.

In United States v. Columbia Steel Co., 334 U.S. 495, 522, 68 S.Ct. 1107, 1121, 92 L.Ed. 1533, it is said: "A restraint may be unreasonable either because a restraint otherwise reasonable is accompanied with a specific intent to accomplish a forbidden restraint or because it falls within the class of restraints that are illegal per se. For example, where a complaint charges that defendants have engaged in price fixing, or have concertedly refused to deal with non-members of an association, or have licensed a patented device on condition that unpatented materials be employed in conjunction with the patented device, then the amount of commerce involved is immaterial because such restraints are illegal per se."

 The price fixing combination was here directed toward a complete destruction of competition in prices in this area. Unless specifically authorized by legislation, a conspiracy to fix prices is in and of itself a violation of the first section of the Act, 15 U.S.C.A. § 1.[17] No inquiry as to substantiality, directness, effectiveness, or reasonableness of restraint is permitted. The section is violated by the agreement to fix prices standing alone under such conditions. But the price fixing phase of the concert did not stand alone. As often happens, it was intermeshed with a purpose to exclude certain producers from the market and to prevent certain dealers from obtaining any supplies of fish. Judge Learned Hand has crystallized the law on this point in Fashion Originators Guild of America v. Federal Trade Commission, 2 Cir., 114 F. 2d 80, 85: "Price fixing is not, however, the only means unlawful per se; the interest of the consumer is not all that determines the 'reasonableness' of a contract 'in restraint of trade.' It is also unlawful to exclude from the market any of those who supply it—assuming that there is no independent reason by virtue of their conduct to justify their exclusion—and it is no excuse for doing so that their exclusion will result in benefits to consumers or to the producers who remain. (Citing cases.) * * * A successful combination among a part of the producers to exclude others, even when not accompanied by an agreement fixing prices, puts into their hands collectively the power to control the supply and with it the price." Again, exclusion of producers and dealers from the market according to prearranged plan is a violation of the statute, in and of itself.

There is, it is true, a dictum of the Supreme Court which may give color of legality even to such acts when done by a labor union or its members in pursuit of legitimate objectives, because of the synthetic effect of the Norris La Guardia Act. Allen Bradley Co. v. Local Union No. 3, 325 U. S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939. But in that opinion there is definite exclusion of this type of organization from the immunization of unions for such acts by

16a. United States v. Columbia River Fishermen's Protective Ass'n, No. C-16087, D.C., Or.*

* No opinion for publication.

17. In United States v. Socony-Vacuum Oil Co., Inc., 310 U.S. 150, Note 59, 60 S.Ct. 811, 845, 84 L.Ed. 1129, it is said: "In view of these considerations a conspiracy to fix prices violates § 1 of the Act though no overt act is shown, though it is not established that the conspirators had the means available for accomplishment of their objective, and though the conspiracy embraced but a part of the interstate or foreign commerce in the commodity." This opinion distinguishes the case of Appalachian Coals, Inc., v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825, which is the main reliance of appellants. In the latter case, the Court said, 288 U.S. at page 373, 53 S.Ct. at page 479: "The plan cannot be said either to contemplate or to involve the fixing of market prices", and 288 U.S. at page 367, 53 S.Ct. at page 476: "No attempt was made to limit production."

pointed reference to Columbia River Packers Association, Inc. v. Hinton, 315 U.S. 143, 62 S.Ct. 520, 86 L.Ed. 750.[18]

If then the boatowners were acting in voluntary conjunction with the fishermen employees of their boats in such a combination, their activities would certainly be illegal. United States v. Women's Sportswear Manufacturers Association, 336 U.S. 460, 69 S.Ct. 714. If, on the other hand, the boatowners and other fishermen, as independent businessmen, were acting in voluntary combination with certain dealers, the concert would be in violation of law. United Brotherhood of Carpenters and Joiners of America v. United States, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973. If, in fact, in all they did, as the evidence shows, they were acting as members [19] of a marketing cooperative, it would afford them no sanctuary for collaboration with others outside the association. United States v. Borden Company, 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181.

As pointed out above, if the dealers did not voluntarily cooperate with the fishermen as members of a marketing cooperative and the restraint of trade was applied only by organized compulsion of picketing and boycotting by the members of the association, the excuse which might have availed union members because of the Norris LaGuardia Act would not have availed the confederates of Local 36.[20]

The next question is whether the picture would have been changed if the Court had not excluded certain proffered evidence claimed to show that the fishermen in 1942 had accepted lower prices than otherwise would have been obtained in order to conduct experiments in canning of barracuda. This was a self-serving venture. But even if the appellants had entered into a cooperative venture in 1942, they had no license to violate the law in 1946. The appellants also offered to prove by expert testimony that the fisherman and farmer are in parallel economic situations and that a large number of farmer associations do carry on collective bargaining without evil resulting. These offers were not relevant, since the Court was concerned with acts of the appellants in restraint of trade. If the acts of the farmers were lawful, it did not tend to prove the acts of appellants were lawful. If unlawful, the fact that another had violated the law would not excuse appellants. In any event, it would require the Court to try an entirely separate case. The Court was not bound to do this. On the other hand, no evidence was offered to the effect that farmers had ever entered an association of the structure of Local 36, or that, using such association as a shield, farmers had ever restrained interstate commerce in grain by any similar agreement and combination such as the evidence shows here.

Appellants complain of the rejection of a letter from Local 36 to all Southern California fish dealers, purporting to outline the purpose and intent of the union and inviting the dealers to a meeting where it was proposed to discuss stabilization of the industry about June 5, 1944, two years before the combination charged by the indictment as of May 1, 1946. Another exhibit rejected was a similar letter circulated a bit later (July 10, 1944), asking the dealers to enter into negotiations for an agreement relative to price and conditions of delivery of fresh fish. The Court also rejected the National War Labor Board award of February 19, 1945, and also another of the War Stabilization Board. The measures necessary for war do not excuse a violation of the law now.

18. Footnote 12 of Allen Bradley case, 325 U.S. page 807, 65 S.Ct. page 1539.

19. The "membership device" will not protect them. Associated Press v. United States, 326 U.S. 1, 19, 65 S.Ct. 1416, 89 L.Ed. 2013.

20. "A restraint of interstate commerce cannot be justified by the fact that the object of the participants in the combination was to benefit themselves in a way which might have been unobjectionable, in the absence of such restraint." Anderson v. Shipowners Association of Pacific Coast, 272 U.S. 359, 363, 47 S.Ct. 125, 126, 71 L.Ed. 298.

Furthermore, appellants offered to prove the history of unionization and strikes and agreements relating to price agreements between fishermen and dealers from 1886 to the present time, together with recognition of the contentions by many national administrative boards. These matters were all remote in time and irrelevant to the charges in the indictment. None of this historical matter was of any value in determining whether appellants were guilty or not guilty of the crime charged in the indictment. All was properly rejected since it would only have tended to confuse the jury.

■ Expert testimony that a fisherman is a laboring producer was offered. This offer spotlights the fundamental error of counsel for appellants. This was a question of fact, not a matter of opinion. As such question of fact, it was submitted to the jury, who found against appellants. It would, of course, have been improper to allow an expert to advise the jury on a matter not subject of opinion testimony.[21]

■ A question is raised by the offer of the document of June 12, 1946, in the midst of the restraint of trade by Local 36, called "A Message to All Market Fishermen," purporting to show the character and aims of the association. This manifesto was rejected as self-serving, and properly so.

■ There was another series of offers of proof in great detail. These related to the economic condition of the fishermen, their failure to get advance orders for fish, when the state law required them to have a secured market before fishing, that collective bargaining increases the harvest of fish, that by collective bargaining the price for fishermen had been raised on occasion and lowered to the consumer, that a larger volume of fish comes in from areas outside of Southern California than is caught in that area, that the dealers there pay the same price to fishermen, that there are tremendous drops in price in a single day, that the price paid to fishermen bears no relation to the amount charged by the fish dealers to consumers, that the fisher-

man is in the same economic position as the farmer, who gets Government help while the fisherman gets none, and as distinguished from the dealer. Market fish competes with other proteins. The fresh fishermen get but little money from their catch annually, and the boatowners not enough to maintain and repair boats. The theory of the offered proof was that the "rule of reason" controlled and to the proposition that original working producers are not prohibited by the Anti-Trust laws from combining originally for the purpose of fixing prices, and that all factors must be considered by the jury. A great deal of evidence was received which was offered by appellants as to the supply of fresh fish in the markets of Southern California, which, in general, indicated that the greater part of the supply comes from Northern California, Mexico, Oregon, Washington and other places in interstate commerce. The general conditions as to supply, methods of bargaining, sale and distribution were all presented. Such evidence bore directly upon the proposition as to the relationship of the fishermen among themselves and with the dealer and the nature of the operation whereby fish were transferred to dealers from the fishermen. The tendered evidence was not relevant for the purpose of showing whether the relationship of the fishermen were workers, producers or independent businessmen or employees of the dealers.

■ There is complaint made of the action of the Court in quashing a subpoena duces tecum to require the records of dealers to be produced but this has already been dealt with under rejected evidence. The appellants urge that the finding of guilt was contrary to law and to the evidence, which is insufficient to support the verdict, and that the Court should have directed a verdict or stricken out all exhibits and testimony. Error is also alleged in denying a motion in arrest of judgment and for a new trial. All these have been considered and the subject matter reviewed. The Trial Court was not in error, as the previous discussion shows.

21. *Farris v. Interstate Circuit, Inc.,* 5 Cir., 116 F.2d 409, 412.

Appellants first excepted to the instruction to the effect that, if the government proved beyond a reasonable doubt that appellants, or any two or more of them, had combined and conspired for the purposes and in the manner charged in the indictment, they might be found guilty. Such an instruction is, of course, one which must be given in every criminal case. The proof must support the allegations of the indictment. The Court had defined reasonable doubt. If either of these instructions had been omitted, unquestionably there would have been reversible error. However, this exception is the gist of all claims of error. It is an extension of the original position that the indictment does not state a cause of action because appellants were operating under the Fishermen's Marketing Act and were exempt under the Clayton Act, and that, even if the government prove the facts set forth in the indictment, still, as a matter of law, appellants were immune. All exceptions to instructions given and requests refused are based on this theory, which only indicates the confusion of mind of counsel for appellants.

One point made was that the Court failed to instruct properly regarding the Fishermen's Marketing Act. Of course, the Court was bound to present the theories of defense in that respect. The Court charged the jury the finding that appellants were "independent businessmen who are engaged in the business" of catching and selling fish to dealers on their own account was a prerequisite to conviction. In that connection, the Court then read portions of the Fishermen's Marketing Act and told the jury that the law permitted such an association and collective organization and bargaining therein, and permitted the collective fixing of prices thereby on behalf of itself or as sales agent for its members. But the Court did instruct the jury that neither such an association nor its members could legally force [22] any buyer of fish to enter into such a price fixing contract "by practices and tactics which are not free and voluntary." And the Court charged that, even if they were acting as independent businessmen under that statute and entered a combination to fix the price of fish and to prevent dealers who refused to pay such prices from obtaining fresh fish from them or from other sources, the scheme would be illegal. The Court left the question to the jury as to whether Local 36 was such an association and whether appellants were acting under the terms of the statute in question. In United States v. Universal Milk Bottle Service, Inc., D.C., 85 F.Supp. 622, it was held, in referring to a conspiracy to fix prices on milk in a local area, the agreement was not immunized by the Agricultural Marketing Act of 1937 or orders of an executive department thereunder. The decisions show that farmers cannot fix prices in the manner which was attempted here [23] according to the jury verdict.

In connection with the instructions as to the Fishermen's Marketing Act, the Court instructed the jury that picketing and boycotting "in and of themselves are not contrary to or in violation of any law," but,

22. In Eastern States Retail Lumber Dealers' Association v. United States, 234 U.S. 600, 611, 34 S.Ct. 951, 954, 58 L.Ed. 1490, L.R.A.1915A, 788, it is said: " 'Section 1 of the act, * * * is not confined to voluntary restraint, as where persons engaged in interstate trade or commerce agree to suppress competition among themselves, but includes as well involuntary restraints, as where persons not so engaged conspire to compel action by others, or to create artificial conditions, which necessarily impede or burden the due course of such trade or commerce or restrict the common liberty to engage therein.' United States v. Patten, 226 U.S. [525] 541, 33 S.Ct. 141, 57 L.Ed. [333] 341, 44 L.R.A.,N.S., 325."

23. United States v. Borden Company, 308 U.S. 188, 204, 60 S.Ct. 182, 84 L.Ed. 181. See also Duplex Printing Press Company v. Deering, Individually and as Business Agents of District No. 15 of the International Association of Machinists, 254 U.S. 443, 469, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196; Swift and Company v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518; United States v. King, D.C., 250 F. 908, 910; Mid-West Theatres Co. v. Co-operative Theatres of Michigan, Inc., D.C., 43 F. Supp. 216, 222.

if such acts were found to have occurred, these could be considered in determining whether the defendants "did or did not conspire as alleged in the indictment. If you find defendants did not so combine or conspire, then you should acquit the defendants." This instruction is a complete answer to the contention of appellants. The use of picketing and boycotting did not give sanctuary to appellants for an illegal conspiracy,[24] as counsel for appellants seem to think. It is only that, in pursuit of a legitimate object of a laboring union, picketing and boycotting are not illegal.

Further, it was requested that all evidence as to strikes, boycotts and picketing were to be disregarded, as "the law is not concerned with any means used by the defendants, but is only concerned with whether the agreement itself is in unreasonable restraint of trade." Again, there was a request that, if the operations of the appellants came within the terms and protection of the Fishermen's Marketing Act, they must find the defendants not guilty, and "if it is reasonably possible for you to conclude that the acts of the defendants have the protection of such Act, it is your duty to so find and acquit the defendants," and, in considering the question, "you should ignore the evidence relating to picketing, boycotting, interstate commerce and strikes." The Court was also requested to say, such evidence "was only admitted for the limited purpose of showing the participation of the various individual defendants in seeking to obtain a price fixing contract. It is the contract alone that determines the legality or illegality of the acts of defendants," and, if it were one which they were legally permitted to enter into, "then you must disregard the evidence of boycotting and picketing for any purpose and find the defendants not guilty." It is obvious enough that, evidentiary cautions of this type were improper since the evidence as to picketing and boycotting was a part of surrounding circumstances without which a complete picture could not have been shown. The effect was carefully limited by the Court. The requested instructions were much too favorable to appellants unless the jury had found they were members of a labor union pursuing legitimate objectives of labor. Other refused requests on this point carried the "worker-producer" theory to the extreme and would have required the jury to find all the acts done by the appellants as shown by the evidence to be legal if, as members of an association, although not "a cooperative as that term is legally and generally understood," was "a bargaining agent or sales representative" for the fishermen, and the members therein were acting together "for the purpose of catching fish" and "of procuring markets and market prices." These requests do not give any play to the illegality of combinations for the purpose of fixing prices or exclusion of producers and prospective purchasers of fish from the market. The Court properly instructed the jury that an organization formed under the act might enter into a contract with a buyer of fish, which fixes the price "at which the association itself or as sales agent for its members sells on behalf of its members the fish caught or to be caught by the members of the association to a buyer." This charge fairly set out what the appellants could ask lawfully.

 The next request refused is to the effect that appellants are "in the same category as agriculturists and horticulturists." Even if they were, that would be no defense. It was not the intention of Congress that the agricultural laborers paid by a share of the crop produced on his land could combine with the farmer to force the wheat dealer to pay a price fixed by such combination. There is a similar defect in the next request, which indicates that a "working producer," who joins solely with other similar "working producers to fix the price of articles produced by them," is immune. Again, there is no law which permits the farmer who does his own work on his own farm to combine with other farmers

24. Duplex Printing Press Company v. Deering, 254 U.S. 443, 469, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196; Lynch v. Magnavox Co., 9 Cir., 94 F.2d 883, 889.

similarly situated to raise the price of grain by picketing all grain dealers or the dealer of their choice at the time.

The Court also read the Clayton Act to the jury, and instructed concerning the rights of labor under this statute and the Norris LaGuardia Act. In this connection, the Court said it was not important whether one of the appellants owned his boat or fished for a lay, but that the application of the act was to be determined by the relationship of the association fishermen "to the fish dealers and not to one another or to any other person." Under the charge, the jury was required to find for conviction that appellants are "independent businessmen" catching and selling fish "for their own account and profit" and not employees of the dealers. The Court expressly said: "An association of independent producers or of persons who are self employed and who are engaged in business on and for their own account and profit, free from such controls as an employer ordinarily exercises over a person who is an employee, would not be a labor union."

It was expressly emphasized that it made no difference that Local 36 called itself a labor union,[25] since the facts as to the charged conspiracy must control, but, if the membership of the association consisted of persons who stood in the relationship of employees to the fish dealers, they might legally combine together and legally carry on acts to effect changes in the terms and conditions of their employment, even though such acts affected or obstructed interstate commerce. The Trial Court also very carefully gave to the jury an instruction based upon the suggestions contained in United Brotherhood of Carpenters and Joiners of America v. United States, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973. This was a commendable precaution which showed that the Court was attempting to protect all legitimate rights of defendants because, if the jury found defendants were independent businessmen and Local 36 was an association thereof, the instruction was not applicable.

The Court went on to say that, if the membership of the association, Local 36 IFAWA, consisted of persons who stood in the relationship of employees to the fish dealers, "the members of said association may join together and carry on acts to effect changes in the terms and conditions of their employment, even though their acts may affect or obstruct interstate or foreign commerce and that in doing so they would be pursuing a legitimate objective," but that such obstructive acts could only be performed if first there were a labor dispute between the members and the fish dealers. If "that controversy is solely one over the price at which the members of Local 36 shall sell their fish," and the employer-employee relationship were not the matrix of the controversy, then the rules relating to a labor dispute would not immunize acts which were otherwise illegal.[26] It is clear this was a sufficient explanation. As we have already seen, there was substantial evidence from which it might have been found as a question of fact that there was not an employer-employee relationship. Under this instruction, the jury has found this proposition as a fact. But the Court by these instructions gave the jury free choice.

25. Each court which has dealt with these various associations of fishermen and boatowners on the Pacific Coast has noted peculiar characteristics of the particular organization. Columbia River Packers Association, Inc., v. Hinton, 315 U.S. 143, 62 S.Ct. 520, 86 L.Ed. 750; Columbia River Packers Association, Inc., v. Hinton, D.C., 34 F.Supp. 970; Hawaiian Tuna Packers, Limited, v. International Longshoremen's and Warehousemen's Union (C.I.O.) D.C., 72 F.Supp. 562; Manaka v. Monterey Sardine Industries, D.C., 41 F.Supp. 531; United States v. Columbia River Fishermen's Protective Assn., No. C16087, D.C.Or.,* Each calls attention to the necessity of basing conclusions in regard to such organizations on facts found and not on occult theory.

* No opinion for publication.

26. The labor union is not given indulgence by the statute if it is the intent and effect to establish any form of market control of a commodity and to "monopolize the supply, control its price, or discriminate between its would be purchasers." Apex Hosiery Co. v. Leader, 310 U.S. 469, 512, 60 S.Ct. 982, 1002, 84 L.Ed. 1311, 128 A.L.R. 1044.

It should not disparage the verdict that the jury took a common-sense view of the evidence without theoretical refinement.

 The request to the Court to instruct that, if Local 36 were a labor union, acting solely in self interest and not in collusion with other economic groups, the action of appellants would be legal is, of course, fully covered by the instructions. The evidence gave firm ground for the finding that it was not an employer-employee relationship and that the fishermen were either in collusion and concert with their employers, the boatowners, or that all the members of the association, as independent businessmen, were compelling independent dealers in fish to pay prices arbitrarily fixed.

 In this field, instructions were proposed to the effect that the fishermen acquire no title to the fish but only the right to use or sell them. The implication is that, since there is no ownership, the fisherman has only his labor in the fish. This vein runs through several other requests. The propositions are advanced that the "worker-producer" is selling his services at wages to be determined by the price of fish delivered and that the employer-employee relationship does not depend upon the existence of a payroll providing for pay at stated intervals. There is interwoven into another request the idea that, if appellants acted as members of an organization in which labor was the basis or one of the chief factors, "they did not act in restraint of trade." These ideas were generally embodied in theoretical homilies worthy of medieval scholasticism. The Court was therefore bound to submit none of them. As has been noted, all the relevant situations as to employment were carefully covered. As to the product price being set for a standard of wages, the same argument would apply to practically all products—certainly, to pears and apples, objects made by hand and, without much deviation, to sales of cattle.

The "rule of reason" was the basis of many requests. On this score, another request was that, if the agreement was one which reasonably might be "considered as a normal or usual agreement for the marketing of their products," then appellants could not be found guilty. In considering whether the restraint was reasonable, appellants also requested the jury be instructed to weigh the state laws preventing waste of fish, the apparent necessity of having a price for a catch set in advance, whether the intention of the fishermen in what they did was to limit the production and sale of fish or to increase production and procure greater markets and whether they were attempting to set the resale or consumer price of fish or trying to stabilize the industry. There was also an attempt to have the charge state that the jury was to consider the history, the difficulties and the intention of appellants in the restraint of fish marketing in the light of the public interest, and that there was no effect on consumer prices.

The Court did instruct that, if the appellants were in fact businessmen who conspired to fix the price, then it was immaterial "whether the price so fixed by agreement among the defendants was reasonable or unreasonable." [27] It was also said the price fixing includes more than the establishment of uniform prices and is proved, if set at a certain level or on ascending or descending scales, or if they are to be uniform or stabilized by various formulae, by placing a floor to increase stability and firmness of market prices and which may prevent the determination of those prices by free competition alone. The Court then said that elimination of competitive evils in an industry is not a legal justification for price fixing contracts otherwise illegal.

---

27. United States v. Trenton Potteries Company, 273 U.S. 392, 396, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989; United States v. Masonite Corporation, 316 U.S. 265, 274, 62 S.Ct. 1070, 86 L.Ed. 1461; United States v. Socony-Vacuum Oil Co., Inc., 310 U.S. 150, 222, 60 S.Ct. 811, 84 L.Ed. 1129; Ethyl Gasoline Corporation v. United States, 309 U.S. 436, 458, 60 S.Ct. 618, 84 L.Ed. 852.

██ The appellants contend and except to the instructions given by the Court on the ground that the restraint imposed by such a conspiracy must have been direct, and that the Government "must prove that the alleged conspiracy would have had a direct effect upon interstate commerce in fresh fish." The fixing of prices always has a direct effect upon commerce in the article.[28] Here the intent charged was not only to fix prices but also to prevent independent fishermen from fishing on the high seas and in foreign waters and from selling the catch so obtained to non-cooperative dealers in the territorial area. Besides legalizing the prevention of shipments from other states to such dealers, any instruction as to reasonableness or substantiality or direct interference with trade and commerce under the circumstances shown by the evidence and charged in the indictment would not have stated the law and would have amounted to a direction to pardon the appellants. It is true likewise that the public interest is involved in such a case and the ultimate aim is to protect the purchasers and users of the product. The jury here necessarily found under the instructions that the intent and necessary effect of the conspiracy was to enable the appellants to restrain or control the supply and the price of the commodities sold or moving in interstate commerce and to discriminate between those attempting to purchase the product.

██ The Court covered fully all legitimate features contained in requests of appellants. The theories of the defense were set forth in detail and on occasion in much too favorable a light as questions of fact. The proposition that the actual activities and conduct of appellants were within the legal objectives of a fishermen's marketing association or a labor union was left to the jury as a question of fact. There was no error. The only criticism of appellants is based upon an assumption that Local 36 is a labor union and a marketing association entitled to the farflung privileges of both.

Since these factors were all correct, we affirm the action of the Court in denying a motion in arrest of judgment. The assignment as to new trial is, of course, not well taken.

██ So far as the indictment, the admission and exclusion of evidence and the instructions of Judge, the trial was fair and impartial. But appellants attack the method by which the juries, grand and petit, were drawn. It is said no criticism is directed at the juries who indicted and tried appellants, either as to composition or attitude. This leaves a choice between black and white. If the particular juries, grand and petit, who considered the charges against appellants were in fact fair and impartial, then the only available ground for attack is that the Court lacked jurisdiction because of the use of any jury drawn by the system in use.

The contention then is made that the jury panel of the Southern District of California, Central Division, was drawn in a manner so inherently defective and unfair that, even if a fair and impartial jury was obtained for this particular trial, still the cause must be reversed. This, upon analysis, seems to be a claim of no jurisdiction in the Court. Juries drawn from the same sources have been serving over a period of years in this District. If the position is correct the Court had no jurisdiction in any case, civil or criminal, tried by jury because the existence of an unfair system of jury selection injures these defendants as appellants say in their briefs. Refutation is contained in the statement of the claim.

There was no complaint made of the character of the jury which tried the case. In fact, the record of the examination of the panel upon voir dire was not brought up on the appeal. We have means of knowing neither who the jurors were nor how they earned a living nor whether each was of "fair character and approved integrity and of sound judgment," as required

---

28. See Coronado Coal Company v. United Mine Workers of America, 268 U.S. 295, 310, 45 S.Ct. 551, 69 L.Ed. 963; United Leather Workers' International Union,

Local Lodge or Union No. 66 v. Herkert & Meisel Trunk Company, 265 U.S. 457, 471, 44 S.Ct. 623, 68 L.Ed. 1104, 33 A.L. R. 566.

by the California Code of Civil Procedure, § 205.

The institution of the jury was anciently and through a course of evolutionary development has remained paladium of the liberties and rights of individuals in criminal cases. It has deservedly attained the high encomiums of the legal writers and theorists during the course of centuries. But it is not upon these that its value to a modern world is based. The tremendous vitality of the institution through the centuries and its adaptability to meet treacherously shifting conditions has enabled it to survive like the Sequoia in a world geologically metamorphized. From a group of the "upper class" men in barbaric societies, convened to protect legal rights and prerogatives of the ruler, it became a group of persons who could say the truth of their own knowledge regarding the possession of land. By subtle blending, it came to take the character, so far as the common man was concerned, of those peers whom the barons of the Magna Charta insisted should pass judgment upon them and their rights as against the crown.

For centuries the jury was subject to intimidation by judges and by the crown and in later times by popular violence. But after the revolutions of 1649 and 1688, in the form in which we have received it in America, it has become a bulwark against encroachments by the government and a protection of the rights of individual citizens. In certain instances, the appellate courts have shown a notable distrust of the jury system in criminal cases in recent years. In one, Jehovah's Witnesses were prevented from placing before the jury a valid defense of arbitrariness and prejudice of the local draft boards.[29] In another, the citizen in business was prevented from placing before the jury of the vicinage the defense of arbitrariness and factual invalidity of regulations, which instead was tried in the Emergency Court of Appeals.[30]

However, in flagrant instances, the jury has always exercised the pardoning power, notwithstanding the law, which is their actual prerogative. This feature is of more importance here, since the jury, notwithstanding the arguments regarding economic oppression, did not see fit to acquit appellants. We have not yet arrived at the point where the doctrine of Theodore Roosevelt, that a single district judge cannot construe an indictment against the government, has been applied to the verdict of a jury. In its modern form, therefore, the juries which reflect common sense and the sentiment of local communities do, in fact, modify the doctrine of law. Such a process is still going on.

The jury system has constantly changed in order to meet the needs of the society in which it has flourished. It is now subject to another challenge. We agree with appellants that, if there is a fundamental defect in the system of selection of the jury panel in a particular district, that in and of itself should be sufficient to vitiate all verdicts returned by a panel so drawn. This is not out of feeling for guilty defendants, but is based on one of the fundamental foundations of the system. One of the imponderables which has contributed to the survival of the institution of jury trials in criminal cases is that it makes each individual who has a chance to be drawn feel that he has a share in the government, and brings home to each that there are duties as well as rights connected with citizenship. One of the pertinent criticisms here then is the fact that for this jury panel no one is drawn who does not return his questionnaire. A still more subtle form of such denial of a share in the government and a share in responsibility is the excuse of the tired business executive who desires to go to Hawaii or Bermuda, the topnotch mechanic who is making ten times as much as the jury fee for attendance, and of day laborers. However, these defects should not overthrow the panel and vitiate all verdicts unless at least there be a clear and present danger that the right of the individual to participate in the burden and the benefit shall be systematically denied. This is not shown in the present case.

29. Falbo v. United States, 320 U.S. 549, 64 S.Ct. 346, 88 L.Ed. 305.

30. Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834.

Even in the time of Bracton,[31] jurors were to be free and impartial and neither too friendly to either of the parties nor drawn from the enemies of either. It is strange to find that the extremes produce the same tendencies. Jury duty was regarded as oppressive. As today, the rich and powerful received exemptions from service,[31a] and the very poor were often let off because of their situation.[31b] The conscience of democracy and the greater education of the members of the body politic in the necessities of government has neither been sufficient to overcome the feeling nor to prevent the results. The banker who wishes to go to Jamaica or Hawaii and the day laborer are still problems. But the only method of curing such tendencies lies with the trial judges.

The jury of criminal cases is the epitome of democracy in our modern state. The attack in this instance on the jury system is an attack on democracy itself. Here, with great elan, by sharp onset it is attempted to overthrow the jury system by the injection of the concepts of class conflict. Our democracy is founded upon the proposition of equality of each citizen to each other as far as political rights are concerned. This ideal has never been realized, but we assume that the great bulk of the people are devoted to its realization. It has been said that the juries could be drawn from the habitues of the park benches. Firmly, we believe that the jury so drawn under the direction of a competent trial judge, administering justice under the law, controlling the court and by his very presence impressing the jury with the equality of every one before the law, can administer justice. A jury likewise of socialites and blue-stockings can be trusted to render justice to those downtrodden by

either political or economic forces. Our experience in democracy has shown that the presence of the name of an official in the social register has not prevented overwhelming masses from voting for him, nor has it prevented him from being a leader in humanitarian movements. The social register has upon its pages the names of highminded idealists devoted to the causes of humanity, the maudlin sentimentalists as to crime and poverty, as well as the birth-proud irreconcilable. All trial judges know there is no economic cleavage in jury systems. If in a sporadic instance it did happen to be so, still the trial judge, who is on the ground, has control of the verdict.

Class war has no place in America. The very contention itself contains a paradox. Yet here it was urged with tremendous force upon the Trial Judge and with earnestness and circumstantiality. The result was a travesty proving the possibility of abuse of the freedom accorded by democratic institutions. The Trial Judge, in order to preserve fairness of demeanor, spent days in investigating the basis of this contention and wrote a long opinion showing its absurdity. Urged as it was, the result was an impertinent obstruction of justice and the progress of the trial. We believe, if it had not been for the conscientiousness of the Trial Judge, faced with certain appellate expressions, the matter could have been disposed of almost summarily.

■■■ The attempt, we believe, was to bring the administration of the law into disrepute. The preposterous and outlandish tactics of the defense in and of themselves amounted to an obstruction of justice. Such tactics upon the part of defense attorneys, in our opinion, deserves censure. We now pass it. If any shade of prejudice came

---

31. Bracton De Legibus Angliae, Fourth Book, Chap. XIX, f. 185. The whole passage is surprisingly modern in feeling, and states the grounds of challenge for cause with particulars still applicable.

31a. Statute of Marlborough, 52 Henry III, c. 14 (1267) by Owen Ruffhead, Esq., London 1763, V. 1, p. 36.

31b. 21 Edward I, c. 1, Ibid., V. 1, p. 129, where the distinction between "diverse persons, being of least ability of his Realm," who are continually troubled by Sheriffs in impanelling them on juries and "the rich People and such as be more able," whom the Sheriffs "do spare" is dramatically drawn. Relief for the former was provided by setting up a property qualification. See also Statute of Westminster Second, 13 Edward I, c. 38, Ibid., V. 1, p. 103.

upon this jury, it was, in our opinion, due to these stage effects of counsel. But, as we have seen, the evidence fully warranted conviction. The conduct of the Trial Judge, although over-conscientious, was impeccable. It is true that the jury commissioner should be careful to follow the principles laid down by the Supreme Court of the United States with regard to jury selection. And it is surprising, after the years which have elapsed since some of these criticisms were announced,[32] that we find them at least in the letter violated. We find the commissioner here accepting a list of names furnished by a woman's social organization at his request. Apparently, use was made of some names of persons obtained from the Labor Temple, also lists supplied by some Railroad Brotherhoods, the Social Registers and membership rosters of country and social clubs.[33] The excuse that he was not paid enough is more startling. Insufficient compensation is no excuse in any public official for failure to perform his full duty. Jurors serve at slight compensation and often at great sacrifice. But the deviations here were comparatively minor and laid no field for the attack which has been made. If the voting lists are used, it must be noted our system permits socialites and communists to vote for President.

The names which were drawn from such sources were an extremely small portion of his list, which was largely selected from the telephone book. Each name on the commissioner's list was balanced by a name drawn by the Clerk from a list of approximately thirty thousand former jurors. This method of getting Federal jurors from lists of former jurors of State and Federal courts has often been used in the past. It is generally satisfactory unless there are peculiar local conditions where policies of exclusion have been followed.

█ The record here does not show any lack of due process since there was no systematic or arbitrary exclusion or discrimination of any persons or class of persons such as the Supreme Court found in Thiel v. Southern Pacific Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181, 166 A.L.R. 1412, and Ballard v. United States, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181.

█ It is assumed that, if the appellants attain their objective, each citizen would have to be tried by members of his own particular segment of the population, selected according to his dictates. Catholics would have to be tried by Catholics, Masons by Masons, Jews by Jews, bankers by bankers and bricklayers by bricklayers. But it must be remembered that this will not always be satisfactory to a defendant. In former days, a bootlegger would much rather trust his fate to a straightlaced prohibitionist minister than to a former saloonkeeper. Indeed, the defendants, at the time of trial in the instant case, asked for instruction that there was to be no consideration given by the jury to any conflict which might have been shown between the American Federation of Labor and the Congress of Industrial Organizations. This instruction was properly withdrawn, as it was not pertinent. It highlights the fact that, to the appellants even, there was much more chance for prejudice against them among the members of their own "class" than there was from the general panel which was drawn. If the judges or officials of the Court had shown discrimination against members of the Congress of Industrial Organizations or a packing of the panel with members of the American Federation of Labor, there might have been a real point.

The appellants did not prove that they could suffer any prejudice. Nor did they prove that any one of them belonged to a "class" against which there was any discrimination. In fact, the appellants do not complain of the jury which tried them. They have not brought before us any list of the members with their economic classification, nor have they even brought to this Court the examination on voir dire.

---

32. Glasser v. United States, 315 U.S. 60, 83–87, 62 S.Ct. 457, 86 L.Ed. 680.

33. Other sources were: Personal property assessment lists, telephone directory, lists of automobile owners, bank employees, Congress of Parent and Teachers, Negroes, Chinese-Americans, Japanese-Americans, Los Angeles Country Club and University Club members.

As a capable trial judge says of the jury system in the Federal Courts:

"Those who are critical of the historic make-up of the jury panel say it must be made more 'representative' and more of a 'cross-section' of the Community.

"This would seem to be not objectionable provided that it is not the be-all and end-all of jury selection. A bricklayer should not go into the jury panel because he is a bricklayer; nor should a bank officer because he is a bank officer. Both are eligible if they have integrity and intelligence enough to listen, retain in their memories the evidence presented, weigh it and honestly decide the cause submitted. We do not need more bricklayers or less bank officers to administer justice.

"I see no objection to seeking out Federal jurors in all groups, provided there is no tampering with the traditional requirement of integrity and intelligence. For a jury panel to be successfully challenged only because it consists of too many of one communal group or too few of another would inevitably completely abort justice. 'The right to challenge is the right to reject, not to select a juror.' Hayes v. State of Missouri, 120 U.S. 68, at page 71, 7 S.Ct. 350, at page 352, 30 L.Ed. 578.

"Mr. Justice Brewer said in Brown v. State of New Jersey, 175 U.S. 172, at page 175, 20 S.Ct. 77, at page 78, 44 L.Ed. 119: '* * * the purpose of criminal procedure is not to enable the defendant to select jurors, but to secure an impartial jury.' "—Judge Goodman, "Federal Jury Selection," 6 F.R.D. 254, 255.

The Trial Judge, in the exercise of sound discretion, extended to appellants, under the Criminal Rules, ten peremptory challenges in place of the three to which they were entitled. It is true, appellants exhausted all ten of these challenges in order to be in the proper technical position' to challenge the array. It is true, as a gesture, appellants asked for more challenges, which were refused. All trial judges know that the key point in selection of an impartial jury is the power of exclusion. In this case, the Trial Judge, in our opinion, went too far, but it was error of which the appellants have no right to complain. The jury which tried the appellants was apparently fair, even on their own standards, and any slight variations from the proper methods of drawing a panel are not deleterious as far as they are concerned. Therefore, the objections and motions against the panel were properly overruled.

The judgment is affirmed.