**THORNTON v. UNITED STATES.**

No. 49112.

United States Court of Claims.

Feb. 5, 1952.

The court, upon the evidence, the report of Commissioner Richard H. Akers, and the briefs and argument of counsel, makes the following

### Special Findings of Fact

1. The plaintiff, Otis Thornton, is engaged in the livestock, commission, and clearing business at Fort Worth, Texas. He operated as a partner in the partnership of Boswell-Kahn-Thornton Livestock Commission Company from the beginning of 1939 until February 1944. As of March 1, 1944, that partnership was sold to Harry Kahn and Otis Thornton who operated as a partnership under the name of Kahn and Thornton Livestock Commission Company until October 1, 1944. On September 30, 1944, the last-named partnership was sold to Otis Thornton, individually, and since October 1, 1944, Otis Thornton has owned the business theretofore carried on by the partnerships. By reason of his acquisition of the partnership business he has come into complete ownership of the claim involved in this suit. For convenience, the term "partnership" will sometimes be referred to as the business entity which carried on the livestock, commission, and clearing business during the years involved in this suit, 1939 to 1944, inclusive, without regard to the several changes which occurred in the partnership relations.

2. In 1944, the Collector of Internal Revenue for the Second District of Texas made demand upon the plaintiff, Otis Thornton, and/or the partnership for taxes, interest, and penalty under the Federal Insurance Contributions Act and the Federal Unemployment Tax Act for the years 1939, 1940, 1941, 1942, 1943, and 1944 in the aggregate amount of $5,891.36, the contention of the collector being that during those years Ruskin Fisk and Dot Alston, cattle commission men, and Louie Mitchell, hog commission man, were employees of the partnership within the meaning of the foregoing statutes and therefore the amount paid them by the partnership should not have been excluded by the partnership in the determination of the taxes due under the Federal Insurance Contributions Act and the Federal Unemployment Tax Act.

3. The plaintiff, Otis Thornton, for himself and on behalf of Boswell-Kahn-Thornton Livestock Commission Company and Kahn and Thornton Livestock Commission Company paid to the collector taxes with penalties and interest which were demanded by the collector, as shown in the preceding finding, in the amounts and on the dates specified as follows:

| Date | Kind of tax | Period or periods for which taxes were paid | Amount |
|---|---|---|---|
| Mar. 24, 1945.. | Federal Insurance contributions. | Second quarter of 1939 to first quarter of 1942, inclusive. | $944.50 |
| Apr. 24, 1945.. | ....do | 1944 | 70.84 |
| Do ....... | ....do | Fourth quarter, 1944 | 20.17 |
| Do ....... | Federal unemployment tax.. | 1944 | 517.98 |
| July 9, 1945.... | ....do | 1939, 1940, 1941, 1942, and 1943 | 4,337.87 |
| | Total | | 5,891.36 |

The receipts which were issued by the collector contained initials to indicate the class of tax involved in the several payments, that is, "F. U. T." to indicate Federal Unemployment tax and "F. I. C. A." to indicate taxes under the Federal Insurance Contributions Act, and also the periods for which the taxes were paid. The notices

and demands under which the taxes were paid likewise contained a similar description of the character of taxes which were being demanded. Of the foregoing amount, $5,190.25 represented taxes and $701.11 interest and penalties.

4. On April 9, 1947, the plaintiff, Otis Thornton, filed in quadruplicate, with the aforementioned collector a claim for refund with interest, for the taxes, penalty and interest in the amount of $5,891.36, which were paid as shown in the preceding finding. The character of tax was described as "Employment Taxes" without any segregation as between Federal Unemployment and Federal Insurance Contributions tax. That claim read in part as follows:

"This claim for refund is filed by Otis Thornton individually and also by Otis Thornton in behalf of Boswell-Kahn-Thornton Commission Company, 219 Livestock Exchange Building, Fort Worth, Texas, and Kahn and Thornton Commission Company, 219 Livestock Exchange Building, Fort Worth, Texas. The claim is for the refund of taxes, interest, and penalties paid under the provisions of the Federal Insurance Contributions Act and Federal Unemployment Tax Act for the years 1939, 1940, 1941, 1942, 1943, and 1944 in the aggregate amount of $5,891.36 plus interest as required by law.

"The basis of the claim is that no employment relationship for Federal employment tax purposes existed during the years involved between Boswell-Kahn-Thornton Commission Company and/or Kahn and Thornton Commission and Messrs. Ruskin Fisk and Dot Alston, cattle commission men, and Louie Mitchell, hog commission man. It is contended that the taxes, penalties, and interest here involved were erroneously assessed and collected by the Collector of Internal Revenue, Dallas, Texas, with respect to remuneration of the aforesaid individuals, Fisk, Alston, and Mitchell, for the years 1939, 1940, 1941, 1942, 1943, and 1944 under the Federal Insurance Contributions Act and/or the Federal Unemployment Tax Act for the reason that Fisk, Alston, and Mitchell were not employees of Boswell-Kahn-Thornton Commission Company during the years 1939 to 1944, inclusive; that the said individuals were not employees of Kahn and Thornton Commission Company during said years; and that in fact and under the existing statutes the aforesaid individuals were in fact independent contractors. Furthermore that during the years 1939 to 1944, inclusive, under the Federal Unemployment Tax Act, exclusive of the three individuals aforesaid, Boswell-Kahn-Thornton Commission Company and/or Kahn and Thornton Commission Company did not employ eight or more individuals on each of some twenty days during the aforesaid calendar years, each such day being in a different calendar week and accordingly that the two firms aforesaid were not subject to taxes under the Federal Insurance Contributions Act and/or Federal Employment Tax Act."

5. By a letter dated October 14, 1947 (including an original and two copies thereof), the collector returned the claims for refund, referred to in the preceding finding, to Otis Thornton. The following reasons for the return of the claims were set out in the letter:

"Separate claims must be filed for each class of tax, namely: Federal Unemployment Tax and Federal Insurance Contributions tax. One Form 843 may be filed covering Federal Insurance Contributions tax for the entire period involved, but separate claims must be filed for Federal Unemployment tax for each calendar year. Blank forms are enclosed herewith for your use in preparing corrected claims.

"Please return corrected claims to this office attached to a copy of this letter."

The foregoing action was taken by the collector without forwarding the claims to the Commissioner of Internal Revenue. The plaintiff took no steps to comply with the directions of the collector and no further action has been taken with respect to the claims either by the collector or the Commissioner.

6. For at least a short time after the enactment of the Federal Insurance Contributions Act and the Federal Unemployment Compensation Act, the administration of these acts was handled in separate units

of the Internal Revenue Bureau, the former in the Miscellaneous Tax Unit and the latter in the Income Tax Unit. In the spring of 1937, the administration of both acts was brought together in the Social Security Tax Unit. However, a separate division was set up within the Social Security Tax Unit for the handling of the administrative problems which arose under the separate acts. Those two divisions were brought together about 1939 in the Accounts and Collection Unit of the Internal Revenue Bureau but separate units were maintained within the division, one to handle the Federal Insurance Contributions Act problems and the other the problems relating to the Federal Unemployment tax. The instructions issued by the collector with respect to the plaintiff's claims for refund, referred to in finding 5, were in accordance with the administrative practice in the Internal Revenue Bureau at the time the claims were filed. Monthly returns were at first required under the Federal Insurance Contributions Act but at least by 1939, and continuing through the period with which we are concerned, only quarterly returns were required. Annual returns were required with respect to the Federal Unemployment Compensation Act. Under the administrative practice in the Bureau, a separate claim for refund was required for each year under the Federal Unemployment Tax Act but under the procedure with respect to the Federal Insurance Contributions Act more than one period could be included in one claim for refund. In other words, in the situation with which we are concerned, under the administrative practice prevailing in the Bureau at the time the claims were filed, six claims for refund were required under the Federal Unemployment Tax Act, that is, one for each year, but it was permissible to include in one claim for refund all of the periods involved under the Federal Insurance Contributions Tax Act.

7. As shown in finding 1, Otis Thornton and the partnerships with which he was connected were engaged in the livestock, commission, and clearing business. He was the office manager and did not personally buy or sell stock in the stockyards. His partners were sheep men; that is, men who bought and sold sheep for the partnership in the stockyards. In addition to dealing in sheep, the partnership also had arrangements with certain individuals, as more particularly hereinafter shown, with respect to dealings in cattle and hogs. In carrying on its business, the partnership was required to secure a bond to protect the public on account of money received by the partnership from the sale of livestock on a commission basis in the yards and also to have a bond to protect the stockyards company for any expense that might be incurred in the feeding and handling of any livestock in the yards. Throughout the period with which we are concerned, the partnership had bonds of the character just referred to. The Fort Worth Stock Yards Company where the partnership operated allotted cattle and sheep pens to the partnership.

8. Ruskin Fisk and Dot Alston were cattle dealers who operated in the Fort Worth Stock Yards under a partnership from January 1, 1939, to December 31, 1941. From December 31, 1941, through 1944, Fisk operated the business theretofore carried on by the partnership as an individual. They dealt solely in cattle and never personally sold, bought, or handled hogs or sheep.

9. The plaintiff partnership made arrangements with Fisk and Alston under which Fisk and Alston took over the cattle pens assigned to the plaintiff partnership and operated a cattle business there beginning on January 1, 1939. Under that arrangement the plaintiff partnership furnished financing, bookkeeping, and office work for Fisk and Alston. The cost of feed and handling cattle in the stockyards incurred by Fisk and Alston was billed by the stockyards company to the plaintiff partnership and paid by the plaintiff partnership. Plaintiff partnership kept a day-to-day and month-to-month record of the business of Fisk and Alston cleared through its office.

The plaintiff partnership received 22 percent of the gross receipts of Fisk and Alston as compensation for its bookkeeping, office, financial, and other services regard-

less of whether or not Fisk and Alston showed a net profit or loss for any given month, which amount was a reasonable charge for the services rendered.

10. In the operation of the cattle business the pens allotted to the plaintiff partnership were operated by Fisk and Alston without any supervision or control by the plaintiff partnership. In such operations, Fisk and Alston hired yard boys to work and handle cattle in the stockyards, fixed their wages, and directed their work, and the plaintiff partnership had no supervision whatever over these employees of Fisk and Alston. As a part of the service rendered for Fisk and Alston, the plaintiff partnership paid these yard boys and other employees of Fisk and Alston but the amounts paid were such as were fixed by Fisk and Alston.

The plaintiff partnership had no control over Fisk and Alston as to the time, hours or days that they would work, had no right to direct Fisk and Alston as to what to do or where to go in the course of business, and had no control over the amount of money they would spend or how they would spend it in the operation of the cattle business. Neither Fisk and Alston nor the employees of Fisk and Alston were under the supervision and control of the plaintiff partnership. While the plaintiff partnership paid the employees of Fisk and Alston, such payments were made by the plaintiff partnership only as directed by Fisk and Alston.

11. From 1939 to 1944, inclusive, the plaintiff partnership had arrangements with sundry other firms similar to the arrangement with Fisk and Alston with the exception that cattle and other livestock were consigned for sale direct to these other firms whereas the cattle that Fisk and Alston received for sale were usually consigned direct to the plaintiff partnership. The primary reason for this difference was that Fisk and Alston did not have bonds of the character referred to in finding 7 for the performance of their business in the Fort Worth Stock Yards. Sometimes, however, cattle would come in consigned to Fisk or to Alston or to Fisk and Alston during the years 1939 to 1944, inclusive, but these cattle were handled in exactly the same way as cattle consigned direct to the plaintiff partnership.

12. As heretofore shown, the plaintiff partnership had its own sheep business which it operated through its own employees. In the furtherance of its business, including the cattle business, the plaintiff partnership advertised in cattle magazines and listed Fisk and Alston as cattle salesmen. However, Fisk and Alston authorized and arranged for this advertising and paid for it through the settlement arrangement with the plaintiff partnership. Likewise some of the stationery of the plaintiff partnership showed Fisk and/or Alston as cattle salesmen and some showed Louie Mitchell as a hog salesman. This was done in an effort to increase the business of Fisk and Alston and Mitchell and thereby increase the profit of the plaintiff partnership in the handling of such business.

13. Louie Mitchell, heretofore referred to, has been a hog dealer in Fort Worth, Texas, since about 1936. He bought and sold hogs on his own individual account and in that business established his own clientele.

During the period 1939 to 1944, Mitchell had an arrangement with the plaintiff partnership for dealing in hogs similar to that previously referred to of the plaintiff partnership with Fisk and Alston for dealing in cattle. Plaintiff partnership paid all of Mitchell's office expense, advertising and telephone bills month by month. In addition, the plaintiff partnership financed Mitchell's operation by paying feed bills and handling charges and deducting the amount of the charges from the customer's money when remitting sales proceeds to the customer. For these services the plaintiff partnership charged Mitchell 40 percent of his gross receipts without regard to whether there was a profit or loss. At the end of each month the plaintiff partnership would make up an account for Mitchell, crediting gross commissions, deducting 40 percent of gross receipts for the plaintiff partnership and crediting the balance to Mitchell. The percentage of gross receipts retained by the plaintiff partnership covered, among other things, the office ex-

penses and telephone bills of Mitchell and these items were not separately deducted.

14. Mitchell hired and paid his own help and directed such help in their work. He paid his own travel expenses and was free to use the telephone for business as he saw fit. The plaintiff partnership had no control over Mitchell from 1939 to 1944, inclusive, as to whom he traded with, how he traded, or as to his business activities.

Many hogs were consigned for sale to Mitchell direct during the period in question, but these were handled by Mitchell and the plaintiff partnership in exactly the same way as hogs which came consigned to the plaintiff partnership and the plaintiff partnership got its percentage of the gross business from such hogs.

15. The individuals on account of whose services the controversy involved in this proceeding arose (Ruskin Fisk, Dot Alston, and Louie Mitchell) did not have bonds of the character described in finding 7 for the protection of the persons with whom they dealt and for the protection of the stockyards on account of feed and handling charges. The arrangements or agreements heretofore referred to between these individuals and the plaintiff partnership were oral.

### Conclusion of Law

Upon the foregoing special findings of fact, which are made a part of the judgment herein, the court concludes that, as a matter of law, the plaintiff is entitled to recover; it is therefore adjudged and ordered that he recover of and from the United States $5,891.36 with interest as provided by law.

Llewellyn A. Luce, Washington, D. C., for the plaintiff.

John A. Rees, Washington, D. C., with whom was Asst. Atty. Gen. Theron Lamar Caudle, for the defendant. Andrew D. Sharpe and Ellis N. Slack, Washington, D. C., were on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

MADDEN, Judge.

In 1944 the Collector of Internal Revenue for the Second District of Texas made a demand upon the plaintiff, Otis Thornton, and upon a partnership of which he had been a member, for taxes asserted to be due under the Federal Insurance Contributions Act and the Federal Unemployment Tax Act for several years prior to 1944. Thereupon Thornton paid on behalf of himself and the partnership $5,891.36 in taxes, interest, and penalties. Thornton is, by succession the sole owner of the claim here involved. Reference hereinafter to acts of the plaintiff, or of Thornton, may be taken to include acts of the partnerships to whose interests he has succeeded, if those acts occurred during the existence of the partnership.

On April 9, 1947, Thornton filed with the Collector a claim for the refund of the $5,891.36. The basis of the claim was that the number of employees during the taxable period was less than eight, and that therefore the taxing statutes in question were not applicable to the employer. The real problem was whether three named persons, asserted by the Collector to be employees, and whose inclusion would have brought the total number of employees up to eight, were employees, or independent contractors.

On October 14, 1947, a few days more than six months after the claim for refund had been filed, the Collector sent the claim for refund back to Thornton telling him in an accompanying letter that separate claims were required for each of the two kinds of taxes; that a single paper covering the Federal Insurance Contributions tax for the several years in question would suffice, but that as to the Federal Unemployment tax a separate paper must be filed for each calendar year. Blank forms were enclosed. The plaintiff took no steps to comply with the Collector's directions. On April 18, 1949, it filed the instant suit.

The Government's first contention is that the plaintiff's claim for refund did not comply with the requirements of Treasury regulations and that the plaintiff is,

therefore, in the position of having sued for the recovery of taxes without first having filed a sufficient claim for their administrative refund. If this were the situation, it would defeat the plaintiff's suit. United States v. Felt & Tarrant Co., 283 U.S. 269, 272, 51 S.Ct. 376, 75 L.Ed. 1025; Morristown Knitting Mills v. United States, 42 F. Supp. 817, 95 Ct.Cl. 552, 566.

As we have said, the plaintiff put its claims for refund of the two types of taxes and for the several different years all in one paper. The asserted impropriety of doing so relates only to one of the kinds of tax, the Federal Unemployment tax. Treasury Regulations 107, promulgated under the Federal Unemployment Tax Act says, in Section 403.602(b) that each claim for refund should be made on Form 843 and that "a separate claim on such form shall be made for each taxable year." It says in (d) that any claim not complying with the requirements of this section will not be considered.

Form 843 which the plaintiff used said in line 2: "2. Period (if for income tax, make separate form for each taxable year) from ....................., 19...., to ...................., 19......" On the back of the form is a space where the Collector is supposed to tabulate the claim or claims. Its first column is headed "Class of tax and taxable year or period." Under this heading are eleven line spaces which carry across the page under the other column headings which include, among others, one for the month and one for the year when each item of tax claimed was listed as assessed.

▌ The plaintiff claims, and we agree, that Form 843 indicated that it was proper, when the claim was not for the refund of income taxes to include in one claim on one paper, taxes paid for several years. He points out that since the period here in question, the Treasury has revised Form 843 to make the form consistent with the pertinent Treasury Regulations.

In the circumstances, we think the plaintiff's claim for refund, which was clearly sufficient in substance, since it had an attached statement setting forth fully the basis of the claim, was not deficient in form. If the fact was that it was not in a form convenient for processing by the taxing authorities, it got into that inconvenient form because of misleading language used on Form 843.

▌ More than six months elapsed before the Collector returned the plaintiff's claim to him with directions to put it in a different form. The Collector had not sent the claim on to the Commissioner of Internal Revenue, and he, of course, never gave any consideration to it. Section 3772 of the Internal Revenue Code, 26 U.S.C. 3772, relating to suits for the recovery by a taxpayer of internal revenue taxes alleged to have been erroneously or illegally assessed or collected says in (a)(1) that no such suit shall be maintained until a claim for refund has been filed with the Commissioner of Internal Revenue, and in (a)(2) that: "No such suit or proceeding shall be begun before the expiration of six months from the date of filing such claim unless the Commissioner renders a decision thereon within that time".

The plaintiff's claim, sufficient in form and substance, having been on file with the Collector for more than six months, though the Collector apparently never forwarded it to the Commissioner, the plaintiff had a right to bring a suit, and to win it if the merits were with him. A few days after this right accrued, his claim was, physically, returned to him, with a direction to refile the claim in a different form. We think that the plaintiff's conduct in neglecting to make any response to the Collector was inconsiderate and risky, but we do not think it had the effect of forfeiting his already accrued right to bring a suit.

The Government's second contention is, that if the three persons whom the Collector classified as employees, thus making the plaintiff's enterprise subject to the two kinds of taxes here in question, were, as the plaintiff claims, not employees but independent contractors, the plaintiff was guilty of participating in a violation of

Sections 303 and 403 of the Packers and Stockyards Act, 1921, c. 64, 42 Stat. 159, 7 U.S.C.A. §§ 203, 223. Section 303 provides that no person shall carry on the business of a dealer in a stockyard unless he has registered with the Secretary of Agriculture, and imposes a money penalty for non-compliance. Section 403 subjects any dealer to liability for the failure of any person acting for such a dealer to comply with the act. Regulations issued pursuant to the statute, 9 C.F.R. §§ 201.1 to 201.23 as amended January 8, 1943, 8 Fed.Reg. 393–401 provide, in §§ 201.10 and 201.27 that a dealer, in order to register effectively, must furnish a bond to secure the performance of his financial obligations. Sections 201.-60, 201.73, and 201.91 of the regulations also impose requirements which seem to have been violated by the plaintiff, if the three persons here involved were independent contractors, as the plaintiff claims. The Government urges that the doctrine of the cases cited by the Supreme Court of the United States in Commissioner of Internal Revenue v. Heininger, 320 U.S. 467 at page 473, 64 S.Ct. 249, 88 L.Ed. 171 prevents the plaintiff from recovering in this suit. The cases there cited were cases of attempts by taxpayers to deduct from income, as "ordinary and necessary" business expenditures, fines or penalties imposed on them for illegal activities, or payments made to buy political influence, or for improper kinds of lobbying.

■ We think that the plaintiff's violation of the Packers and Stockyards Act, which seems to have occurred, did not subject him to taxes levied under wholly different laws and having no special relation to the stockyard business. He either had eight employees or did not. If he did, he was taxable. If not, he was not subject to the taxes here in question, however reprehensible it may have been for him to deal through persons who were not his employees, and were not properly licensed as dealers. If he had listed them as employees, and paid the consequent taxes, that would not have relieved him of liability to the penalties for violating the Stockyards Act, if in fact the persons were not employees. We think that to impose these taxes as a penalty for the violation of another law, if they are not by their terms applicable, is not warranted.

■ We reach at last the merits of the plaintiff's claim for refund. The activities, on behalf of the plaintiff, of the three persons whose status as employees *vel non* gave rise to this suit, are described in findings 8–15 and will not be repeated here. Section 1426(d) of the Internal Revenue Code, 26 U.S.C. § 1426(d) says: "The term 'employee' * * * does not include (1) any individual who, under the usual common-law rules applicable in determining the employer-employee relationship, has the status of an independent contractor * * *." Treasury Regulation 90, promulgated under Title IX of the Social Security Act, 42 U.S.C.A. §§ 1101–1110, says, of the employer-employee relation: "Generally the relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done."

The activities of the three persons, as described in the findings, seem to us to show that they were not employees. The Government offers us no reason for reaching a contrary conclusion.

The plaintiff is entitled to recover $5,891.-36 with interest as provided by law.

It is so ordered.

JONES, Chief Judge, and HOWELL, WHITAKER and LITTLETON, Judges, concur.