**CAPE SHORE FISH CO., Inc.,**
v.
The **UNITED STATES.**
No. 120–59.

United States Court of Claims.
April 17, 1964.

Francis P. Noonan, Washington, D. C., for plaintiff. Robert S. Caviness, Washington, D. C., was on the brief.

J. Mitchell Reese, Jr., Washington, D. C., with whom was Asst. Atty. Gen., Louis F. Oberdorfer, for defendant. Edward S. Smith, Lyle M. Turner and Philip R. Miller, Washington, D. C., were on the brief.

Before JONES, Chief Judge, WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

PER CURIAM.

This case was referred pursuant to Rule 45 to Herbert N. Maletz, a trial commissioner of this court, with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in a report filed January 24, 1963. Exceptions to the commissioner's report were taken by the plaintiff, briefs were filed by the parties and the case was submitted to the court on a waiver of oral argument by counsel. Since the court is in agreement with the findings and recommendation of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is therefore not entitled to recover and its petition is dismissed.

Cape Shore Fish Co., owner and operator of the Lauren Fay, a boat engaged in fishing for scallops out of New Bedford, Massachusetts, has brought this action for refund of social security and unemployment taxes it paid for 1953 and 1954 with respect to the captains and crews of the vessel.

Section 1410 of the Internal Revenue Code of 1939, 26 U.S.C. § 1410 (1952), imposed a social security excise tax on every "employer" of 1½% in 1953 and 2% in 1954 of "wages" paid by him with respect to "employment". "Wages" were defined in section 1426(a) as "all renumeration for employment", with exceptions not relevant here. "Employ-

ment" was defined in section 1426(b) as " * * * any service, of whatever nature, performed after 1950 * * * by an employee for the person employing him * * * on or in connection with an American vessel * * *" "Employee" was defined in section 1426(d) (2) as "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee * * *"

Section 1600 of the 1939 Code imposed an unemployment excise tax of 3% on every "employer" of "wages" paid by him with respect to "employment". Sections 1607(c) and 1607(i) of the Code defined "employment" and "employee" comparably to sections 1426(b) and 1426(d) (2).

The sole issue in this action is whether the captains and other crew members of the Lauren Fay were employees within the meaning of sections 1426(d) (2) and 1607(i).

During the years in question, the operations of the Lauren Fay were largely governed by provisions of a so-called Independent Scallopers Agreement—a standard form union contract—to which Cape Shore and the Atlantic Fishermen's Union were parties. The owner hired the captain of the Lauren Fay and had the right to fire him at the end of any trip.[1] In practice, the captain was hired with the understanding that if he performed in a manner satisfactory to the owner, his services would be continued; in fact, the owner made every effort to retain a skipper so long as he did a good job. Thus, the first captain continued on for the vessel's first 25 trips; a successor hired in 1954 served for most of that year until fired by the owner.

No special license or papers were required to become a captain; it was enough to be a practical fisherman with at least three years' experience.

In accordance with the custom in the industry, the captain hired and fired the

[1] All actions on behalf of the owner, Cape Shore, were taken by Israel Kestenbaum, its president and controlling stockholder.

crew [2] and supervised and controlled the crew's activities at sea. Since the success of the voyage depended on the combined skill of all hands, the captain tried to obtain qualified fishermen as crew members. Ordinarily a person became a good fisherman after five or six trips.

As in the case of its captain, some crew members remained with the boat for repeated voyages. In 1953, for example, two crew members accompanied the boat on all its 25 trips to sea, and five accompanied it on 16 or more trips.

Each captain of the Lauren Fay followed the owner's instructions when they were given and considered that the owner had authority to give him instructions, such as when to return to port, when to paint the boat, and whether liquor would be permitted aboard. The captain was required to telephone the owner a day or two before the end of the voyage and to report on the amount of the catch, what troubles were experienced, and what repairs, if any, were needed. At that time the owner usually instructed the captain to have the boat docked before 5:00 P.M.

The captain felt that if he did not follow the owner's instructions, he might be fired. A captain did not give instructions to the owner; rather, he made suggestions concerning the vessel's operations which the owner might or might not follow.

In accordance with a practice understood and agreed to by the owner and the captain and crew, the Lauren Fay stayed at sea for seven or eight days, or until some 11,000 pounds of scallops were caught, whichever first occurred. The union contract specified that while at sea the hours of labor for the captain and crew were to be no more than six hours on watch and no less than six hours off between a watch. The contract also specified that the captain and crew were to be afforded a four-day rest period ashore after the boat docked. By virtue of the contract, and in accordance with custom, the boat left port the day after the rest period ended, barring bad weather or the need for laying up for repairs. The union contract prohibited departure earlier than 9:00 A.M. or later than 5:00 P.M. Within this period, the captain fixed the exact sailing time.

Fishing was generally done in an area between George's Bank and Nantucket Shoals, some 100 miles from New Bedford, at a location determined by the captain.

When the vessel docked, its catch was sold at public auction in the New Bedford "selling rooms" to the highest bidder. The captain could reject the final bid and have the catch held over and again put up for auction on the next day. This right of holding over was never exercised during the years in question.

The purchaser of the catch paid for it by a check made out to the vessel and the check was deposited in the owner's accounts. The owner then distributed the proceeds in accordance with the following formula referred to in the fishing industry as the "lay": From the total proceeds or "gross stock", there were deductions (referred to as "gross expenditures") for fixed amounts called "pers" for the engineer, mate and cook; for per diem charges for rental of a fathometer; the cost of scallop bags; the cost of a watchman; and for the New Bedford Fishermen's Benevolent Fund.

The remainder was referred to as the "net stock". Thirty-five per cent of the net stock was kept by the owner as the "boat share". From this 35%, the owner paid the captain 10% for his services and $25.00 to the engineer.

Sixty-five percent of the net stock was the crew's share. From this the owner deducted and paid to the respective suppliers the amounts for the crew's groceries, fuel, lubrication oil and the ice in which the bagged scallops were packed. The owner then distributed the remaining amount equally among the members of the crew, including the cap-

2. On one occasion the captain was instructed by the owner to hire fishermen who would work longer hours than permitted by the union contract.

tain, after having made deductions for withholding of Federal income and social security and unemployment taxes. In its Federal income tax returns, the owner claimed as deductions under the heading "Salaries and Wages" all amounts paid to the captain and crew.

After the catch was sold, the fishermen, including the captain, unloaded it. If a fisherman preferred not to help unload, a substitute, called a "lumper", could be hired. The lumper's wages were deducted from the fisherman's share of the lay.

If the individual's share of the voyage was less than $10.00 per man, the trip was considered a "broker",[3] and if the boat were at sea at least five days, the owner was required by the union contract to pay at least $1.00 a day to the captain and each member of the crew. The custom in the industry was that if the same crew sailed on the next trip, all expenses of the broker, including those for the crew's groceries, fuel and ice, would be combined with those of the next trip, and the two trips considered as one for purpose of making distribution of the proceeds from the catch. But if a different crew sailed on a trip following a broker, the owner was responsible for all expenses of the broker.

 The union agreement provided for "maintenance and cure" of $3.00 per day to the captain and each member of the crew.[4]

The crew's groceries and other supplies were ordered by the captain or cook on the owner's credit. The owner was responsible for payment of these bills.

All repairs for the boat were paid by the owner, and major repairs could not be undertaken without the owner's authorization.

The owner carried and paid for all insurance on the Lauren Fay.

The fishermen supplied their own clothing and rough-weather gear, together with a scalloping knife which cost about $1.50. The owner provided all the gear used in dredging scallops from the ocean floor. Neither captain nor crew had any investment in the boat.

When the boat was in port and painting or other work was necessary, crew members who performed such work were paid $10.00 per day.

Plaintiff says that on the basis of the above facts the captain and fishermen were not employees within the meaning of sections 1426(d) (2) and 1607(i) of the 1939 Code, both of which specifically adopt the common-law test for ascertaining the existence of the employer-employee relationship.

 The touchstone for determining the presence or absence of an employer-employee relationship is, of course, whether the person performing the services for another is subject to the other's control or right to control.[5] De-

---

3. Compare the English translation of the Marine Ordinance of Louis XIV, title 4, article 7, at 30 Fed.Cas. 1209:
 "And as for the seamen and others going by the profit or freight, they shall not pretend any wages for equipping or damages, if the voyage be broke, retarded or prolonged by a superior power, whether before or after the departure of the ship * * * "

4. "Maintenance and cure" is a duty on the part of the owner "which arises from the contract of employment" to provide food, shelter and necessary medical attention for a seaman who is injured or becomes ill while in service, both during the voyage and for a reasonable time thereafter if the seaman has not recovered when the trip ends. Calmar S.S.

Corp. v. Taylor, 303 U.S. 525, 527, 58 S.Ct. 651, 653, 82 L.Ed. 993 (1938). For the current status of maintenance and cure see The Supreme Court, 1961 Term, 76 Harv.L.Rev. 90 (1962).

5. Treasury Regulations 128, § 408.204, which were in effect in 1953 and 1954, provided the following tests to determine whether an employer-employee relationship exists under the usual common-law rules:
 Generally (an employer-employee) relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is

grees of control, opportunities for profit or loss, investment in facilities, permanency of relation and skill required are important in determining status as employee or independent contractor, but no one factor is controlling nor are these factors exclusive.[6] The relationship is to be ascertained by an over-all view of the entire situation, not by any rule of thumb, or by the presence or absence of a single factor. The result in each case must be governed by the special facts and circumstances of the case itself. United States v. Silk, 331 U.S. 704, 716, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947); Bartels v. Birmingham, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947); Enochs v. Williams Packing Co., 370 U.S. 1, 2, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962); De-Raef v. United States, 70 F.Supp. 264, 108 Ct.Cl. 255 (1947); Thornton v. United States, 102 F.Supp. 554, 121 Ct.Cl. 520 (1952); Weatherguard Corp. v. United States, 146 F.Supp. 942, 137 Ct.Cl. 359 (1957); Ed-

wards v. United States, 168 F.Supp. 955, 144 Ct.Cl. 158 (1958); Meredith Publishing Co. v. Iowa Employment Security Comm., 232 Iowa 666, 6 N.W.2d 6 (1942).

While the formula for determining whether one person working for another is an employee or independent contractor is a simple one, this is largely "illusory because it is more largely simplicity of formulation than of application. Few problems in the law have given greater variety of application and conflict in results than the cases arising in the borderland between what is clearly an employer-employee relationship and what is clearly one of independent, entrepreneurial dealing." N. L. R. B. v. Hearst Publications, 322 U.S. 111, 121, 64 S.Ct. 851, 855, 88 L.Ed. 1170 (1944).

In this context, the first problem is to determine whether the Lauren Fay's captain was an employee or independent contractor. This depends essentially on whether the owner had the right to exer-

accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor. An individual performing services as an independent contractor is not as to such services an employee under the usual common law rules. Individuals such as physicians, lawyers, dentists, veterinarians, construction contractors, public stenographers, and auctioneers, engaged in the pursuit of an independent trade, business, or profession, in which they offer their services to the

public, are independent contractors and not employees.

Whether the relationship of employer and employee exists under the usual common law rules will in doubtful cases be determined upon an examination of the particular facts of each case.

See also Restatement of the Law, Agency, 2d, § 220.

6. The Restatement of the Law, Agency, 2d lists the following matters of fact, among others, to be considered in determining whether an employer-employee relationship exists: the extent of control which the employer may exercise over the details of the work; whether the one employed is engaged in a distinct occupation or business; whether the work is generally done under the direction of the employer or by a specialist without supervision; the degree of skill required in the particular occupation; whether the employer or workman supplies the tools and places to work; the length of time for which the person is employed; the method of payment (whether by time or job); whether the work is part of the employer's regular business; whether the parties believe they are creating an employer-employee relationship; and whether the principal is or is not in business. Id. § 220.

cise control over details of operating the boat (signifying the owner's right to exercise control over the captain) or whether the captain conducted his own fishing business and was merely paying the owner hire for the use of the boat. In the latter event, the captain would have been a demise or bareboat charterer and in the eyes of the law the owner pro hac vice. Gilmore & Black, Admiralty 216 (1957).

Generally, in the maritime industry hire (or rent) under a demise charter is on a pre-determined lump-sum basis, depending on the size of the vessel and the term of the charter. However, in the fishing industry it is customary that a boat be chartered to a master not for a lump sum but for a share of the proceeds from the fishing operation. Cromwell v. Slaney, 65 F.2d 940, 941 (1st Cir. 1933). Obviously, when the owner charters on this share or lay basis, he has a greater incentive from a profit standpoint to exercise more control over the vessel's operations than an owner who has chartered on a fixed lump-sum basis. For this reason, in the fishing industry it is frequently difficult to determine whether the master is a charterer (independent contractor) or an employee of the owner.

Here the salient considerations are these: The owner hired the captain and had the right to fire him at the end of any trip. This is compatible with an employer-employee relationship for one does not "fire" a charterer. The owner's policy was to keep a captain as long as he did a satisfactory job. Hence, the relationship between owner and captain was a reasonably permanent and continuing one necessary in carrying on the owner's business.

The captain felt bound to follow various instructions given by the owner. Not only is this recognition of an employer-employee relationship, it negates any implication that the captain was owner pro hac vice under a charter.

As was customary in the fishing industry, the captain and not the owner hired the crew. However, the owner exercised some control over hiring in that he instructed the captain to hire fishermen who would work longer hours than prescribed by the union contract.

Certain details of the fishing operation, such as how much time elapsed between trips and the maximum number of hours the captain and crew could work while the boat was out to sea, were governed by the union contract to which the owner was a party and the captain and crew beneficiaries. These requirements are consistent only with an employer-employee relationship.

Other details of the fishing operation, such as how long the boat remained at sea, were governed by custom in the trade and agreed to by the owner and captain. While the owner, in accordance with custom, did not tell the captains in what part of the waters within reach of New Bedford to fish for scallops, this is not incompatible with an employer-employee relationship. The captain was presumably hired for the reason, among others, that he was familiar with the location of choice fishing areas near New Bedford, and as in the case of a manufacturer employing a skilled artisan or specialist, the owner had neither the knowledge nor the desire to interfere with his methods. See Restatement of the Law, Agency 2d § 220, comment (i).[7]

The owner carried and paid for a full line of insurance on the vessel and crew;

---

7. "The word [employee] indicates the closeness of the relation * * * rather than the nature of the service or the importance of one giving it. Thus, ship captains and managers of great corporations are normally superior [employees], differing only in the dignity and importance of their positions from those working under them. * * * (T)he control or right to control needed to establish the [employer-employee] relation may be very attenuated. Thus * * * where an emergency creates peril to human lives, as in the case of a ship in a storm, [an employee]—in this case the captain—might properly refuse to be controlled by the ship owner and still cause [the latter] to be liable for his negligence * * *." Restatement of the Law, Agency 2d, § 220, comments (a), (d).

had authority to order major repairs on the boat; and was responsible for payment for all repairs. Were the captain the owner pro hac vice, these matters would have been within his cognizance.

Except for the provision that he was to receive 10% of the owner's share, the captain's share of the proceeds was figured under the union contract in the same manner as the crew's. Furthermore, it was the owner's duty to pay the captain maintenance and cure. The owner's obligation in this respect is the clearest kind of recognition of an employer-employee relationship since maintenance and cure is available only to an employee of a ship owner, not to an independent contractor.[8] Similarly the owner's duty to pay the captain at the rate of $1.00 per day in the event the trip were a "broker" is characteristic of employment status, not of a charter relationship.

The owner's responsibility for paying all bills for food and supplies is further indication that an employer-employee relation was contemplated. If the captain were owner pro hac vice, it would have been his responsibility—not the vessel owner's—to pay such bills. Cromwell v. Slaney, 65 F.2d 940, 941 (1st Cir. 1933); The Carrier Dove, 97 F. 111 (1st Cir. 1899).

Further factors indicating that the captain was an employee and not the owner pro hac vice are these: payment for the catch was made by the buyer to the owner, not the captain, and deposited in the owner's accounts; the owner paid the captain and crew their share of the proceeds; all accounting details with respect to the fishermen's shares were handled by the owner's accountant, not by the captain.

▮ In summary, the owner had the right to hire and fire the captain and to give him instructions of various kinds. The owner was party to arrangements governing the duration of the fishing voyage, the hours of work aboard the vessel while at sea, the period of rest ashore, and the vessel's permissible departure time. The owner was obligated to pay the captain maintenance and cure if he was injured at sea; also to pay him specified per diem compensation in the event a trip was a broker. The owner was responsible for all repairs, for all indemnification and other insurance on the boat, for payment of all bills for food and supplies, for paying the captain and crew their share of the proceeds, after receiving payment for the catch, and for handling all accounting details.

These factors establish that the owner had a right to and did exercise control over details of operating the Lauren Fay; that the fishing business carried on was the owner's and not the captain's; and that the captain was not owner pro hac vice under a charter arrangement. "Retention by the general owner of such command, possession and control is incompatible with the existence at the same time of special ownership in the charterer." The Norland, 101 F.2d 967, 971 (9th Cir. 1939). Or as Justice Holmes said in Paine v. Silva, 168 Mass. 432, 47 N.E. 118 (1897):

> " * * * in the case at bar there was no such letting. The general owners remained in control of the vessel. There is nothing to qualify that conclusion in the fact that the vessel was sailed on what is called the 'Provincetown Lay,' by which the master receives a commission from the proceeds of the fish caught, and then, subject to certain other deductions, the proceeds are divided between owners and crew in a fixed proportion.[9]

8. See also page 14, infra.

9. On the other hand, "it has been held by the courts that, under a 'fishing lay,' where the captain employs the members of the crew *and controls all operations of the vessel, both in purchasing sup-* plies *for the voyage, in determining where he will fish, how long, and in disposing of the catch and settling all the bills, he becomes the owner pro hac vice, and that the crew is in the employ of the master and not of the owner."* (Emphasis added.) Cromwell

If the captain was not owner pro hac vice, neither was he a partner with the owner.[10] He had no investment in the Lauren Fay; shared none of the expenses of repairs; did not share losses; and was not liable to third parties for supplies used during the voyage or for debts of the vessel. "Where the master of a ship contracts to receive a certain proportion of the profits in lieu of wages, this does not constitute him a partner with the owner." Brown v. Hicks, 24 F. 811, 813 (C.C.D.Mass.1885). Accord Coffin v. Jenkins, 5 Fed.Cas. p. 1188 (No. 2,948) (C.C.D.Mass.1884); The Dirigo First, 60 F.Supp. 675 (D.Mass.1945). Cf. Julio v. Ingalls, 1 Allen (Mass.) 41 (1861), where a contribution of $1000 by the master made him a partner. See also Domandich v. Doratich, 165 Wash. 315, 5 P.2d 310 (Wash.1931).

▮ Turning to the status of members of the crew, the important distinction between them and the captain is that they were hired and fired by the captain and were subject to his direct supervision and control. Aside from that, most of the factors governing the relationship between owner and captain are equally applicable in respect of the relationship between the owner and crew. Thus, Article 1 of the union contract provided that it "shall apply to and cover all fishermen, including captains who are not owners, mates, deckhands, engineers and cooks. * * *" In signing the contract the owner agreed, among other things, to recognize the union; to require the captain and crew members to join the union; to make reasonable provisions for the health and safety of the captain and crew during the course of operations; to furnish to the captain and crew information with respect to withholding of Federal taxes; and to make payments to a fund established to provide benefits to widows and dependents of fishermen. Though the union contract is not conclusive as to the existence of an employer-employee relationship,[11] such contractual provisions are of the kind an employer normally enters into with a union representing employees. They would be highly unusual provisions in a partnership agreement or in an agreement with an independent contractor. In a partnership or independent contractor relationship, each party would ordinarily make his own provisions for health and safety, prepare his own withholding statements for tax purposes, and make his own arrangements for retirement and disability. An employer is often expected or required to take care of certain administrative and financial obligations of his employees. A partner or independent contractor is expected to handle these matters himself.

It is relevant too that the owner withheld income taxes before paying the captain and crew their share of the proceeds of the catch, and that on its income tax returns, it treated all proceeds of the catch as its gross income; all expenses for supplies, including those deducted from the crew's share of the gross stock, as its deductions; and all amounts paid to the captain and crew as its deductions characterized as "salaries and wages".

▮ The fact that the captain and crew received compensation not on a fixed-sum basis but by sharing in the proceeds of the voyage under the "lay" system does not derogate from an employer-employee relationship. The "lay system" is as old as the New England fishing in-

---

v. Slaney, 65 F.2d 940, 941 (1st Cir. 1933). In Adams v. Augustine, 195 Mass. 289, 81 N.E. 192 (1907); The Carrier Dove, 97 F. 111 (1st Cir. 1899); and Thompson v. Hamilton, 12 Pick (Mass.) 425, 23 Am.Dec. 619 (1832), the captain was found to be owner pro hac vice. The opposite conclusion was reached in The Norland, supra; Justillian v. Versaggi, 169 F.Supp. 71 (SDTex. 1954); Paine v. Silva, supra; and Hard-

ing v. Souther, 12 Cush (Mass.) 307 (1853).

10. The owner did not file a Federal partnership tax return with the captain. This would have been required if such a relationship existed. 26 U.S.C. § 187 (1952).

11. See Ringling Bros. Barnum & Bailey Combined Shows v. Higgins, 189 F.2d 865 (2d Cir. 1951); Glenn v. Standard Oil Co., 148 F.2d 51 (6th Cir. 1945).

dustry itself. See 2 U. S. Comm. of Fish and Fisheries (Goode editor), Fisheries Industries of the United States (1884), Parts I–III. Indeed, in ancient times it was customary that not only fishermen but merchant seamen as well shipped for a share of the profits.[12] By 1836, "agreements by which seamen (were) to participate in the adventure, and to derive their reward from its success, (were) rare, and (were) probably limited, in commercial experience, to privateering and fishing voyages. * * *" Reed v. Hussey, 20 Fed.Cas. pp. 440, 444 (No. 11,646) (S.D.N.Y.1836). But even in 1836 it was well recognized that "such agreements do not constitute partnerships, but are merely a hiring of the seamen, and the shares agreed upon are wages, and are recoverable as such." Reed v. Hussey, supra. And as early as 1844 Justice Story made this comment (Coffin v. Jenkins, 5 Fed.Cas. p. 1188 (No. 2,948) (C.C.D.Mass.)):

> "This lay or share does not, according to law, create any partnership in the profits of the voyage, as has been sometimes erroneously supposed; but it is in the nature of wages for seamen in the common merchants service, and is governed by the same rules. * * * Indeed, I consider it too well settled now to admit of any reasonable doubt".[13]

United States v. Laflin, 24 F.2d 683, 685 (9th Cir. 1928), is in the same vein:

> "It has been the maritime law from the time of Oleron that agreements, by which seamen, engaged in a fishing or whaling voyage, are to receive for their services shares of the profits of the voyage, are contracts

of hiring, and the shares so agreed upon are in the nature of wages, to recover which actions may be maintained after the end of the voyage." [14]

A further factor is that members of the Lauren Fay's crew were unskilled and could become good fishermen after a half dozen trips. "Unskilled labor is usually performed by those customarily regarded as (employees)". Restatement of the Law, Agency 2d, § 220, comment (h); Tapager v. Birmingham, 75 F.Supp. 375 (D.Iowa 1948). Likewise it is pertinent that members of the crew had no investment in the boat, shared none of the expenses of repair, did not share losses and were not liable to third parties for supplies used during the voyage or for debts of the vessel.

Still another indication of employment status was the owner's carrying of protection and indemnity insurance for the vessel. Under the Jones Act, 46 U.S.C. § 688 (1952), an injured seaman may sue the owner for injuries caused by negligence of the owner or a fellow seaman, but only if he "first establish that there existed between him and the defendant at the time of the injury the relationship of employer and employee." Nolan v. General Seafoods Corp., 112 F.2d 515, 517 (1st Cir. 1940). See also Hudgins v. Gregory, 219 F.2d 255 (4th Cir. 1955); Mason v. Enanisevich, 131 F.2d 858 (9th Cir. 1942); Osland v. Star Fish & Oyster Co., 107 F.2d 113 (5th Cir.1939); The Norland, 101 F.2d 967 (9th Cir.1939); Cromwell v. Slaney, 65 F.2d 940 (1st Cir. 1933); Justillian v. Versaggi, 169 F. Supp. 71 (SD Tex. 1954); and Domandich v. Doratich, 165 Wash. 315, 5 P.2d

12. Hiring on a share of the freight was a form of contract unknown to the Roman law, which recognized only the hiring by the voyage for an entire sum. Curtis, Merchant Seamen 71 (1841).

13. A sentence in Melville's Moby Dick 57–58 (Int'l Collectors Lib. ed.) also adds a bit of insight:
"I was already aware that in the whaling business they paid no wages; but all hands, including the captain, re-

ceived certain shares of the profits called lays, and that these lays were proportioned to the degree of importance pertaining to the respective duties of the ship's company."

14. See also Joy v. Allen, 13 Fed.Cas. p. 1163 (No. 7552) (C.C.D.Mass.1846); The American Beauty, 295 F. 513 (WD Wash. 1924); Van Camp Sea Food Co. v. Di Leva, 171 F.2d 454 (9th Cir. 1948).

310 (Wash.1931). And see Cambra v. Santos, 233 Mass. 131, 123 N.E. 503 (1919). Thus the fact that the owner carried and paid for insurance indemnifying it for all suits brought against it by the captain and crew occasioned by accidents at sea and that neither the captain nor crew carried such insurance is a reflection of the owner's recognition of its liability for accidents at sea resulting from negligence of the owner or crew. So, too, it is recognition by the captain that he did not need such protection. This is compatible only with the understanding of the parties that the owner was the employer of the captain and crew and that the captain was not the crew's employer. See Southern Shell Fish Co. v. Plaisance, 196 F.2d 312 (5th Cir. 1952); O'Hara Vessels, Inc. v. Hassett, 60 F. Supp. 672 (D.Mass.1942).

The owner's obligation to pay maintenance and cure is similar indication of the crew's employee status. "In the United States this obligation has been recognized consistently as an implied provision in contracts of marine employment * * * [and is] an incident of the marine employer-employee relationship." Aguilar v. Standard Oil Co., 318 U.S. 724, 730, 63 S.Ct. 930, 933, 87 L.Ed. 1107 (1943). See also Calmar S.S. Corp. v. Taylor, 303 U.S. 525, 527, 58 S.Ct. 651, 82 L.Ed. 993 (1938); Knight v. Parsons, 14 Fed.Cas. p. 776 (No. 7,886) (D.Mass. 1855); The City of Avalon, 156 F.2d 500 (9th Cir.1946); The Montague, 53 F. Supp. 748 (WD Wash.1943).

It is also of some significance that the proceeds from each catch were paid to the owner, deposited in the owner's accounts, and distributed by the owner to captain and crew on the share basis; and that pursuant to the union contract, the owner was required to make a detailed accounting with the captain and crew as to the proceeds from the catch and the specific deductions therefrom. Implicit in this is the parties' understanding that the owner had the property interest in the catch and hence controlled the fishing business. Indeed, in ascertaining the question of control the owner's duty to account was given particular weight in Harding v. Souther, 12 Cush (Mass.) 307 (1853):

And a most significant provision, showing not only an interest, but the entire control over the voyage as owner, is the stipulation that * * * (the owner) will render a just and true account of the sales of all the fish which may be delivered to him by the master, and will account with the master or with each fisherman for their respective shares or proportions. This contains a clear implication that all the fish are to be delivered to the owners, who are to sell them and account to the various fishermen entitled to the proceeds * * *.[15]

From all this, the conclusion is apparent that the captains and crew of the Lauren Fay were during the years in question employees of the owner of the vessel within the meaning of the social security and unemployment tax statutes.[16]

This conclusion is in harmony with the holding of the Federal District Court in Massachusetts where on similar facts the same result was reached. O'Hara Vessels, Inc. v. Hassett, 60 F.Supp. 672 (D. Mass.1942). There the plaintiff owned fishing boats weighing over 10 tons which apparently operated out of Boston. Compensation of captain and crew was computed on a "lay" or share basis essentially the same as that involved here. Supplies were ordered by the captain. The captain hired and fired the crew, and determined when the boat fished and

---

15. See also United States v. Laflin, 24 F. 2d 683 (9th Cir. 1928); Knight v. Parsons, 14 Fed.Cas. p. 776 (No. 7,886) (D. Mass.1855); Lewis v. Chadbourne, 54 Me. 484, 92 Am.Dec. 558 (1865).

16. The Massachusetts decisions, both State and Federal, with the exception of Maniscalco, infra, have held uniformly that New England fishermen were wage earners, not partners or independent contractors. See O'Connor, Fishermen and the Law, 16 Green Bag 582 (1904).

when it returned to port. The terms and conditions of employment of captains and other crew members were covered by a union contract with the Atlantic Fishermen's Union (the union involved in this case). Ordinarily the captain received no detailed instructions from the owner with respect to handling the crew. In the rare cases when there were "brokers" the owner at different times gave the crew approximately $5 each. The owner paid for liability insurance, and from time to time claims were presented by crew members to the insurance company under these policies and the claims settled by the company.

The issue in that case—the same as here—was whether captains and other crew members on plaintiff's boats were "employees" within the meaning of sections 1410 et seq. of the 1939 Code. The court held plaintiff was the "employer" of the captains and crews within the meaning of these Code sections, and hence (at 674) "that the plaintiff is liable for taxes on account of the 'employment' of the captains and members of the crews of the five vessels here in controversy * * *".[17]

In 1950 the Supreme Court of Massachusetts decided Commonwealth v. McHugh, 326 Mass. 249, 93 N.E.2d 751, which involved an antitrust action brought by the Commonwealth against the Atlantic Fishermen's Union and certain of its officers. One of the defenses raised was that the State had no jurisdiction to try defendants, since their activities were covered by the terms of the

Federal Fishermen's Cooperative Marketing Act, 15 U.S.C. §§ 521, 522 (1958), which permitted "[p]ersons engaged in the fishery industry, as fishermen, * *" to act together in associations to catch, produce and market their products, and which provided a Federal remedy for antitrust violations by such associations. The court, in dealing with this defense, said (93 N.E.2d at 764) the Act dealt only with—

> "associations of independent entrepreneurs each of whom, or at least most of whom, are engaged in fishing on their own separate accounts * * * and not to a labor union of fishermen employed by others."

It then continued (ibid.):

> "The defendants are employees of the vessel owners and not entrepreneurs on their own accounts. They so insist in their brief. According to former decisions of this court they do not own the fish which they catch * * * although, so long as they work under the lay system of compensation, they have an interest in the price which the fish brings."

Plaintiff's counsel in support of his contention that the captain and crew were not employees has cited Maniscalco v. Director of Division of Employment Security, 327 Mass. 211, 97 N.E.2d 639 (1951); Local 36 of International Fishermen & Allied Workers of America v. United States, 177 F.2d 320 (9th Cir. 1949); and Crawford Packing Co. v. United States (SD Tex.), 228 F.Supp.

17. In 1951 the Department of Justice secured an antitrust indictment against the Atlantic Fishermen's Union, the Sea Food Producers Association and 5 union officials charging them with engaging in a conspiracy to restrain unreasonably, and with monopolization of, the production and sale of fish in New Bedford. It is curious in light of the O'Hara Vessels decision that the indictment alleged that "fishermen who are members of the (Atlantic Fishermen's Union) are not employees, workers, or laborers, but are independent businessmen engaged in fishing for their own account and profit." An-

other curious factor is that the allegation was immaterial since antitrust immunity is not afforded a union-employer combination to effect a direct commercial restraint such as was charged by the indictment. Allen-Bradley Co. v. Local Union No. 3, International Brotherhood of Electrical Workers, 325 U.S. 797, 65 S. Ct. 1533, 89 L.Ed. 1939 (1945). See also Report of Attorney General's National Committee to Study the Antitrust Laws (1955), pp. 297–300. In any event, the allegation was later stricken by the court as surplusage.

549 aff'd United States v. Crawford Packing Co., (5th Cir., 330 F.2d 194.

Maniscalco involved the question of whether there was evidence to support a finding that crew members of certain fishing boats were "employees" within the meaning of a Massachusetts unemployment compensation statute which, the court said, followed the common law definition. The court held that on the record presented there was no evidence to support a finding of employee status. But the evidence presented in that case differs from the facts of this case in the following important respects: no orders of any kind were ever given by the owner, even if he went on the trip himself; all decisions, such as where to fish, the type of fishing, the duration of the trip and the selling price of the catch, were decided by a majority vote of the crew, with the owner's vote, if he went on the trip, counting the same as any other member; there were no provisions of any kind for a minimum wage in the event of a "broker"; the loss was carried over to the next trip and "the owner was entitled to collect from a member his share of the loss"; there was apparently no union representing crew members, and no written employment contract of any kind.

The opinion itself in Maniscalco recognized the distinction between the facts in that case and a case such as the present one. It referred (327 Mass. at 215) to testimony given by the Secretary-Treasurer of the Atlantic Fishermen's Union (the union involved here) "which, based on practices and customs with which he was familiar, tended in the opposite direction." This testimony was not considered by the court since it was "about boats that the Atlantic Fishermen's Union had under agreement" and "he did not know about the Italian fleet, the boat owners in question."

The narrow basis of the court's decision in Maniscalco is shown by the concluding paragraph of the opinion (97 N. E.2d at 642):

"We are not to be understood as laying down a rule of law that fishermen shipping on boats on the 'share' or 'lay' basis are not employees of the owner. The question is one of fact. * * * We hold only that on the records here the judge correctly ruled that the decisions of the board to the effect that the petitioners were 'employers' were not supported by the evidence. *On other evidence the result might very well be otherwise.* (Emphasis added.)"

Two of the cases cited in support of the last sentence just quoted were Commonwealth v. McHugh, supra, and O'Hara Vessels, supra, both of which held fishermen were employees of the boat owner. Hence the court expressly recognized as correct its earlier decision and the decision of the Federal District Court for the District of Massachusetts that captains and crews of fishing boats represented by the Atlantic Fishermen's Union and operating under the union contract in the manner in which the present plaintiff's boat operated in 1953 and 1954 were employees.

The Local 36 case involved a criminal antitrust indictment for price fixing and related illegal activities. The court, in sustaining a conviction, considered appellants' argument that the activities found illegal were legitimate activities of the labor union bargaining for increased wages. It held this argument invalid for several reasons, one of which was that, based on the evidence, "no inference that Local 36 is a labor union could be drawn" (177 F.2d at 330). This evidence was that "[a] large proportion of the members of the association (Local 36) owned and operated their own boats and gear. Well over half of these members classify themselves as self-employed fishermen"; and there were "numbers of these boats which have only the operator and owner himself aboard" (177 F.2d at 329).

Furthermore "(a)lthough there was a possibility of employment between the captain and the fishermen in the same boat, that was not the attitude of the

fishermen themselves." On the contrary, the court (177 F.2d at 329) found it "noteworthy that, as to the time upon which they embark upon a fishing trip, the locality to which they go, the type fish which they intend to take *depends upon agreement between* the individual fisherman in a boat and the captain." (Emphasis added.) See also Gulf Coast Shrimpers and Oystermen's Ass'n v. United States, 236 F.2d 658 (5th Cir. 1956).

That Local 36 and the present action have little in common is evident. There is no analogy between captains and crews of the Lauren Fay and a self-employed fisherman who owns his own boat. Nor were crew members on the Lauren Fay consulted about when to fish or where to fish. They were told what to do by the captain, who in turn felt bound to follow instructions given by the owner and was subject to the terms and conditions of the union contract.

In Crawford Packing, boat owners successfully maintained an action for refund of social security and unemployment taxes paid with respect to fishermen engaged in fishing shrimp in the Gulf of Mexico. After lengthy findings of fact the District Court for the Southern District of Texas concluded that the fishermen were not employees,[18] stating:

> "The essential facts of this case are not different from those considered by the United States District Court for the Southern District of Mississippi in the case of Williams Packing & Navigation Co., Inc. v. J. L. Enochs [D.C.], * * * 176 F.Supp. 168 and affirmed, 291 F.2d 402 (5th Cir. 1961), certiorari granted * *

18. The facts in Crawford Packing differed in material respects from the facts here. Furthermore, a Texas jury had previously reached an opposite conclusion on facts similar to those in Crawford, finding that crews on shrimp boats operating in the Gulf of Mexico were employees of boat owners. Clegg v. United States (SD Tex. decided November 29, 1961—Jury verdict, not reported).

368 U.S. 937 [82 S.Ct. 379, 7 L.Ed.2d 336.]. The District Court there found that the shrimp fishermen were not employees under the Social Security Act * * *."

The decision in Williams Packing upon which the conclusion in Crawford Packing was based has since been vacated and remanded by the Supreme Court with direction to dismiss for lack of jurisdiction. 370 U.S. 1, 82 S.Ct. 1125, 8 L.Ed. 2d 292 (1962). In the Williams case the District Court had found, among other things, that shrimp and oyster fishermen were not employeees of the boat owner and enjoined the Government from collecting social security and unemployment taxes from a company engaged in providing trawlers for such fishermen. The Supreme Court emphasized (370 U.S. at 8, 82 S.Ct. at 1129, 8 L.Ed.2d 292) that in general "[T]he Act prohibits suits for injunctions barring the collection of federal taxes when the collecting officers have made the assessment and claim that it is valid." The Court added that the "record * * * clearly reveals that the Government's claim of liability was not without foundation." (370 U.S. 8, 82 S. Ct. 1129, 8 L.Ed.2d 292)

■ Plaintiff further argues that sections 1426(b) (15) and 1607(c) (17) of the 1939 Code are unconstitutional because they discriminate between vessels over 10 tons and vessels under 10 tons.[19] The settled law is to the contrary. Carmichael v. Southern Coal Co., 301 U.S. 495, 510–512, 57 S.Ct. 868, 81 L.Ed. 1245 (1937); Chas. C. Steward Machine Co. v. Davis, 301 U.S. 548, 584, 57 S.Ct. 883, 81 L.Ed. 1279 (1937).

19. These sections exempt from social security and unemployment taxes services performed by an officer or member of the crew on a fishing vessel of less than 10 net tons. A comparable provision is contained in section 3306(c) (17) of the 1954 Code.